**Opinion issued August 29, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-11-00292-CV**

————————————

**CHRISTUS HEALTH GULF COAST (AS AN ENTITY, D/B/A CHRISTUS ST. CATHERINE HOSPITAL, AND FORMERLY D/B/A CHRISTUS ST. JOSEPH HOSPITAL), Appellant**

**V.**

**LINDA G. CARSWELL, Appellee**

---

**On Appeal from the 165th District Court**
**Harris County, Texas**
**Trial Court Case No. 2005-36179**

---

**O P I N I O N**

Linda G. Carswell sued CHRISTUS Health Gulf Coast (as an entity, *d/b/a*

CHRISTUS St. Catherine Hospital and formerly *d/b/a* CHRISTUS St. Joseph

Hospital) ("Christus") for negligence after her husband, Jerry Carswell, died at CHRISTUS St. Catherine Hospital ("St. Catherine") in January 2004. Carswell also asserted claims for post-mortem fraud, breach of fiduciary duty, and negligence ("the post-mortem claims") concerning Christus's attempt to obtain her consent to an autopsy. Following trial beginning on August 11, 2010, a jury found in favor of Christus on Carswell's medical negligence claims, and Carswell does not appeal the adverse jury verdict on these claims.

The jury found in favor of Carswell on the post-mortem claims, awarding her $1,000,000 for mental anguish and $1,000,000 in exemplary damages, which the trial court reduced to $750,000 pursuant to the statutory cap on exemplary damages. In four issues, Christus contends that: (1) the trial court erred in entering judgment on Carswell's post-mortem fraud claim because the jury's finding was not supported by legally or factually sufficient evidence and because the claim was an improperly recast health care liability claim; (2) the trial court cannot enter judgment in favor of Carswell on her post-mortem breach of fiduciary duty and negligence claims because the jury's findings on those claims are not supported by legally and factually sufficient evidence; (3) the trial court used the incorrect date to start calculating the amount of prejudgment interest to which Carswell is entitled; and (4) the trial court erred in imposing sanctions against Christus.

We vacate the trial court's award of $250,000 in monetary sanctions against Christus. We also modify the award of prejudgment interest and affirm the judgment of the trial court as modified.

## Background

### A. Factual Background

Jerry Carswell, a sixty-one-year-old man suffering from severe right-side pain, was admitted to St. Catherine on January 19, 2004. Physicians subsequently diagnosed Jerry with kidney stones and discovered a small mass on his right kidney. To aid with the pain, Dr. Paul Cook, Jerry's attending physician, prescribed several different narcotics, such as morphine and Lortab, during the course of Jerry's stay at St. Catherine. These were discontinued on January 21, however, because Jerry was experiencing mental confusion, and his physician, Dr. Cook, was concerned about creatinine levels showing Jerry had 50% kidney function. Jerry was scheduled to be discharged from St. Catherine on January 22 so that an outpatient MRI could be done for further diagnosis of the renal mass. Around 3:00 a.m. on January 22, 2004, in response to Jerry's report of severe pain, Dr. Christine Pramudji, who was on call for Dr. Cook, authorized the administration of up to 75 mg of Demerol every three hours and 25 mg of Phenergan every four hours, as needed.

3

Registered Nurse Maria Corral testified that she administered 75 mg of Demerol and 25 mg of Phenergan to Jerry around 3:30 a.m. and observed him for approximately fifteen minutes after administering the medications. Licensed Vocational Nurse Angela DeLucia testified that Jerry was sleeping when she checked on him around 4:00 a.m., and DeLucia observed no signs of respiratory distress at that time. However, Rhonda Edwards, a phlebotomist, testified that De Lucia and Corral left Jerry's room with a syringe at around 5:00 a.m. Corral told Edwards that she could finish her other rounds because Corral had just given pain medication to Jerry. Around 5:15 a.m., when Edwards returned to Jerry's room for a routine blood draw, she discovered him lying across the foot of his hospital bed and thought he was dead.

Edwards and Corral called for a "Code Blue," and the Code team, including nightshift charge nurse Lee Ann Lightfoot, attempted to resuscitate Jerry. During the team's efforts, Dr. Diana Fite, the emergency room physician leading the team, requested that Edwards draw blood from Jerry to test for cardiac enzyme levels.[1] The Code team was ultimately unable to resuscitate Jerry, and he was pronounced dead at 5:38 a.m. Lightfoot called Linda Carswell and her son, Jordan, and asked them to come to St. Catherine.

---

[1] Edwards testified that she gave these blood samples to a courier from St. Joseph Hospital to be tested during Jerry's autopsy.

Because the cause of Jerry's sudden death was not readily apparent, Dr. Pramudji, who came to St. Catherine during the Code, ordered a "complete" autopsy around 6:00 a.m.  Dr. Pramudji had never ordered an autopsy before, and she asked Lightfoot what she needed to do. Lightfoot responded that all Dr. Pramudji needed to do was write "order complete autopsy" on Jerry's chart, and St. Catherine "would take care of the rest."  Dr. Pramudji testified, via video deposition, that she ordered a complete autopsy "because [she] wanted a complete investigation into what happened to [Jerry]."  Because no one witnessed Jerry's death and his death was not explained, St. Catherine was obligated to contact the Harris County Medical Examiner's Office ("HCMEO") and inform it of the circumstances of Jerry's death so it could determine if it wanted to conduct an autopsy and an investigation.

Linda Carswell testified that when she arrived at St. Catherine, Dr. Pramudji and Lightfoot told her and Jordan about Jerry's death.  Dr. Pramudji told Carswell that Jerry had had pain in the night and that "she didn't know what had happened, but that he was dead."  Lightfoot then commented that Carswell could take comfort in the fact that Jerry "died peacefully[, h]e died in his sleep."  Carswell asked several times, "what happened," but neither Lightfoot nor Dr. Pramudji said anything.  Lightfoot asked Carswell several times whether she wanted the tubes

5

removed from Jerry's body, but Carswell replied that she wanted all of the tubes left in and that she wanted all samples to accompany Jerry's body for the autopsy.

Barbara Lazor, the director of acute care services, stopped by Jerry's room to speak with Carswell. According to Carswell, Lazor was the first person at St. Catherine with whom she discussed an autopsy. Carswell told Lazor that she wanted an autopsy performed and that she "wanted to know what was going on because it didn't all match." Lazor replied that Dr. Pramudji had requested an autopsy. Carswell initially assumed that the autopsy would be performed at St. Catherine, and she told Lazor that she wanted the autopsy performed elsewhere, such as at the HCMEO. Lazor responded that Carswell could have a private autopsy done, but a private autopsy would be very expensive and, because Dr. Pramudji had ordered an autopsy, Carswell should "just let the hospital do that." Lazor then stated that an autopsy by St. Catherine would be "the very same type of autopsy as if you went to an independent autopsy." Lazor told her that St. Catherine would contact the HCMEO.

Lazor testified that she spoke with Carswell and offered her condolences, but she denied having any further interaction with her and she denied discussing an autopsy with her. Lazor testified that she had no involvement either with contacting the HCMEO or with obtaining Carswell's consent to the autopsy. Lazor stated that the HCMEO had already been contacted by the time she arrived at St.

6

Catherine that morning and that nurses play no role in obtaining consent to an autopsy from surviving family members.

Carswell testified that she next spoke with Patty Elam, the charge nurse on the surgery/med floor for the dayshift, who had arrived at St. Catherine at 6:42 a.m. Elam went to Jerry's room to express her sympathy to Carswell and said, "It shouldn't have happened." Elam also stated, "I think I know what happened. But I wasn't here and I can't talk about it." She brought with her a document that appeared to Carswell to be a release from liability. Carswell asked Elam whether St. Catherine had called the HCMEO because she wanted that office to perform an autopsy, and she told Elam that she was not signing the release document. Elam said she brought the "wrong thing" for Carswell to sign. Carswell told her she wanted an autopsy and to bring back the right document. Elam then told her that the HCMEO did not accept the case and would not investigate because it had been told that Jerry's cause of death was "renal failure."

Elam subsequently brought a "Consent for Postmortem Procedures" form and asked Carswell to sign the form to document that she consented to allowing St. Catherine to take care of Jerry's autopsy. The form states:

> Autopsy Permission: AUTOPSIES ARE ONLY TO BE DONE ON PHYSICIAN'S ORDERS. Perform an autopsy upon the body of the deceased in order to determine or attempt to determine the cause of death or the progress of the disease of the deceased. I specifically grant permission to such doctors, their assistants, and their designees

to remove, study, examine, test and retain for scientific purposes all organs or tissues from the body, head, or extremities of the deceased.

Under this paragraph was a line stating "Complete autopsy" with boxes available to check "Yes," "No," or "N/A" and a line stating "Limited autopsy" with boxes available to check "Yes" or "No" and a line to "[s]pecify limitations/restrictions." Carswell checked the "Yes" box in the "Complete autopsy" section, and she wrote "N/A" on the "specify limitations/restrictions" line for "Limited autopsy" because she "didn't mean to exclude or limit anything" from the autopsy.

The form admitted by the trial court also had the "No" box checked by "Medical Examiner Case," and the form listed a contact person—"Mathis"—and stated the time, "0635."[2] Carswell stated that she did not fill in any information concerning the medical examiner's office on the form. When she signed the form, she was "mainly focusing on 'complete autopsy'" because she "wanted to know everything when [she] signed [the form]."[3] Carswell testified that no one from St. Catherine explained the autopsy policies and procedures to her.

---

[2]     The top section of the form concerns organ and tissue donation. The form reflects that Lightfoot contacted LifeGift and spoke with a coordinator at "0636."

[3]     Jordan Carswell testified that he and Linda did not know what "complete autopsy" meant, but they "assumed that it meant it would be exhaustive in figuring out what happened. We assumed they had a specific thing they meant when they said 'complete.' We understood that would mean that they would be doing everything they could to find the cause of death."

8

Patty Elam testified that she was not involved with contacting the HCMEO. She also stated that she did not have a conversation with Lightfoot about calling the HCMEO, that she did not discuss contacting the HCMEO with anyone, and that she did not discuss the phone call to HCMEO, specifically, or the autopsy, generally, with Carswell. She testified that she had nothing to do with obtaining Carswell's signature on the consent form, that she did not discuss Jerry's cause of death with either Carswell or Jordan, and that she would not have said that Jerry's cause of death was renal failure.

Jordan Carswell testified that neither Dr. Pramudji nor Lightfoot told him and his mother why Jerry had died, but Dr. Pramudji indicated that she was going to order an autopsy. He stated that he and Linda both wanted the medical examiner to be involved with the autopsy, because they knew that the medical examiner was independent from the hospital, and they asked St. Catherine personnel if they were calling the HCMEO. Jordan testified that Elam told them that she was going to call the HCMEO. He stated that, at one point, he walked up to the nurse's station, waited for Elam to end a phone call, and asked her a second time about the medical examiner. Elam told him that "she had contacted them, and she said they were not interested in looking into it any further." Jordan stated that he did not know what, if anything, regarding Jerry's death was told to the

9

HCMEO. When asked whether he had any reason to disbelieve what the nurses said concerning the HCMEO, Jordan replied:

> No. We were confused. We thought [the HCMEO] was going to be a way for us to find out what happened. So we were confused and disappointed about what she told us, that they weren't going to look into it; but I didn't have any reason to doubt that she had talked to them.

Jordan stated that the family wanted an "independent autopsy" because they "felt like [they] weren't getting a lot of answers at the hospital, and [they] wanted to have somebody else look at it." He further testified that there was limited communication with St. Catherine personnel, and, as a result, the family "wanted somebody who [they] thought might be more aggressive in finding out what had happened."

Lightfoot testified that she spoke with Dr. Pramudji about ordering an autopsy. She also stated that she called the HCMEO concerning Jerry's death, contradicting her deposition testimony, in which she denied calling the HCMEO. She acknowledged that, on the autopsy-consent form, she checked that the case was not a "Medical Examiner Case" and she recorded the name of the person that she spoke to at the HCMEO, "Mathis," and the time that she called.[4] Lightfoot then testified to what she "would have communicated" to the HCMEO employee, but she did not state what she actually said to the employee. She stated:

---

[4] The only "Mathis" identified in the record is an employee of Christus, not the HCMEO.

10

> I would announce who I was and the hospital I was representing, the name of the deceased, and a little summary about the deceased: his age, date of admission, diagnosis, and series of events leading up to the death. Then I would answer questions from the ME.

Lightfoot also stated that she "would review medications" that had been prescribed, the circumstances of the death, and whether the death was unwitnessed, unexpected, or unexplained. Dr. Pramudji was standing next to her when she called, and she stated that she would have told the HCMEO about Dr. Pramudji's "preliminary view" concerning Jerry's cause of death. Lightfoot did not tell the HCMEO that Jerry's cause of death was renal failure. There is no record that Lightfoot reported that nurses administered Demerol and Phenergan to Jerry before his death.

After obtaining Carswell's consent to an autopsy, St. Catherine ultimately sent Jerry's body to an affiliated hospital, CHRISTUS St. Joseph Hospital ("St. Joseph"), for the autopsy to be performed by a pathologist with SJ Associated Pathologists, L.C. ("SJAP"), a pathology group that contracts with St. Joseph to use their laboratory and morgue facilities. Carswell testified that, at the time she signed the autopsy-consent form, she did not know that St. Joseph and St. Catherine were affiliated.

Prior to transferring the body, Tham Hoang, a St. Catherine employee, took a sample from one of Jerry's blood draws that had been taken on the day that he died—but not the Code Blue blood draw—and stored it in the laboratory freezer.

11

Hoang took this sample from the blood draw "in case the pathologist performing the autopsy needed additional materials." She averred that she informed a pathologist at SJAP that she had taken this sample, but SJAP never requested the sample, and Hoang forgot that it existed. Christus alleged that it did not discover the existence of this sample until October 2007, when it asked Hoang about policies concerning the destruction of laboratory samples and she remembered that she had taken and stored this sample.[5] Christus informed Carswell about this sample at a hearing in November 2007. This sample was allegedly destroyed shortly before trial in August 2010.

SJAP assigned Dr. Jeffrey Terrel to perform Jerry's autopsy. Dr. Terrel testified that he is not a forensic pathologist. He further testified that his pathology group is under a contract to work exclusively for St. Joseph's and that the entities have been in "partnership" since "the late 40s." He himself has been working in the "partnership" for thirty-three years. However, Dr. Terrel stated that neither St. Catherine nor St. Joseph influences how he, or any other SJAP pathologist, conducts an autopsy and that SJAP is independent from the hospitals. He stated that all decisions made during the autopsy, such as which tissues to retain and which tests to perform, were made solely at his discretion. Dr. Terrel had

---

[5] Martha Rushing, St. Catherine's Manager of Laboratory Services, averred that, pursuant to St. Catherine policy, all blood samples in the laboratory are maintained for seven days in a refrigerator before being discarded.

"everything [that he] needed in this case to perform a full and complete and accurate autopsy."

Although he has performed over 1,000 autopsies, Dr. Terrel testified that he does not do toxicology drug screening as part of his "normal routine." He stated that he had the Code blood samples available, as well as blood from the body itself, to perform toxicological tests, but he did not perform any such tests because he did not think they were necessary in this case. He testified that he did not do so in this case because, upon reviewing Jerry's chart, he "didn't see anything suggesting to [him] that the dosages [of Demerol and Phenergan] were wrong or atypical." Dr. Terrel testified that if toxicology screenings had been performed on Jerry's blood or urine samples, the tests would have shown the concentration of drugs in Jerry's system around the time of his death.

Dr. Terrel testified that it is common for pathologists to retain tissue samples for further study and investigation during an autopsy, and, occasionally, the pathologist retains entire organs. He stated that this is done at the pathologist's sole discretion, and the pathologist generally does not report this retention to the hospital. In this case, during the autopsy, Dr. Terrel retained approximately one-third of Jerry's heart tissue for further study.

Dr. Joye Carter, a former Harris County Medical Examiner, testified that Dr. Terrel performed a "limited autopsy" and that a "complete autopsy" would have

included toxicology screenings, which is standard practice in the forensic autopsies performed by medical examiners. She stated that the medical examiner's office exists "to protect and assist non-forensic institutions in determining what's happened to their patients." She also testified generally concerning the procedures for initiating an inquest by the medical examiner's office, and she opined that the HCMEO would have accepted this case for an autopsy if it had known about the amount of Demerol and Phenergan administered to Jerry and the proximity of this administration to his death. She further testified that medical-examiner personnel are trained to elicit considerable information concerning the death when the HCMEO receives a call and that the medical examiner should be called if the cause of death cannot be determined. She stated that the HCMEO would have retained all bodily fluids for proper testing, performed a drug screen, taken witness statements, reviewed all medical records, and determined the cause and manner of death.

Because of the confusion about Jerry's death, on January 30, 2004, eight days after Jerry's death, Carswell prepared and hand-delivered a letter to the St. Joseph Pathology Department requesting that it "retain or keep all of the autopsy samples" because she "didn't want anything thrown away." Her letter stated:

> The purpose of this correspondence is to request that all microscopic sections and/or all tissue/fluid/physical samples and studies be preserved following any diagnosis that may be made. I also require a complete catalog of all equipment that was found inserted or attached

14

to my husband's body as a result of procedures prescribed by his physician during his hospital stay and any equipment used during procedures administered as part of the emergency "code" called when his body was found on January 22, 2004. . . . Please expedite the final report on this autopsy.

Carswell did not request that work on the autopsy report cease. However, Dr. Terrel testified that he stopped working on the autopsy because continued testing of the retained tissues would destroy the tissues in violation of Carswell's letter. Dr. Terrel never completed the autopsy, nor did he give any other explanation for his decision to terminate it.

Dr. Terrel's final autopsy report, completed on February 11, 2004, listed the following findings: (1) renal cell carcinoma on the right kidney; (2) "calculus" on the left kidney; (3) "Pylorus: abscess with phlegmon formation, bacterial colonization, and peritonitis, localized"; and (4) congestion in the right lung. After reviewing the final autopsy report, Dr. Cook, Jerry's attending physician, listed the following as causes of death on the death certificate: (1) localized peritonitis; (2) abscess and phlegmon gastric pylorus; and (3) right renal cell carcinoma. Dr. Cook listed the manner of death as "natural." Carswell testified that she contacted Dr. Cook after she received the death certificate and she asked him how the listed causes of death could have actually caused Jerry's death. In response, Dr. Cook "stumbled around and little bit and said, 'Well, I don't know. I mean, I just don't know. These are findings from the autopsy report.'"

15

## B. *Procedural Background*

On June 7, 2005, Carswell sued Christus for medical malpractice. She alleged that Christus employees were negligent in, among other things, failing to properly evaluate Jerry's condition before and after administering a large dose of Demerol and Phenergan. In her third amended petition filed on January 5, 2007, Carswell first asserted the post-mortem claims addressing the conduct of Christus employees in obtaining her consent to the autopsy and the retention of Jerry's heart tissue. The post-mortem claims included claims for fraud, breach of fiduciary duty, Deceptive Trade Practices Act violations, conversion and replevin, intentional infliction of emotional distress, breach of contract and breach of warranty, and civil conspiracy. Carswell's tenth amended petition, her live petition at the time of trial, asserted pre-mortem negligence, negligence per se, and gross negligence claims regarding the administration of Demerol and Phenergan to Jerry and the nurses' subsequent monitoring of Jerry, post-mortem fraud, post-mortem breach of fiduciary duty, and a claim for interference with the right of internment regarding Christus's retention of Jerry's heart tissue.

In 2005, Carswell sent Christus requests for production seeking, among other things, "[a]ll tissues, fluids, specimens, and/or slides containing tissues or fluid in your possession concerning Jerry Carswell."

In March 2006, Christus moved the trial court to allow it to inspect, sample, and microscopically examine portions of Jerry's heart tissue that had been maintained by SJAP. Christus argued that its expert, Dr. Thomas Wheeler, had visually inspected the heart tissue and "concluded that further microscopic tests would be useful in evaluating potential causes of death." Christus stated that, if the court granted permission, "a very small sample of cardiac tissue will be taken and examined microscopically," and it did not anticipate that the procedure would "destroy or materially alter the heart tissue." On August 28, 2006, the trial court denied this motion.

In his deposition in October 2006, Dr. Terrel testified that he had retained Jerry's entire heart during the autopsy. Although Christus vigorously disputes this assertion, Carswell claimed that this was the first time that she learned that Jerry's entire heart had been retained and was not buried with him. Christus contends that Carswell actually learned about the retention of Jerry's heart tissue in March 2006 when Christus's counsel called Carswell's counsel and "specifically told him that [the specimens retained by Dr. Terrel] included a portion of Mr. Carswell's heart." In March 2006, Christus had also faxed Dr. Wheeler's expert report to Carswell's counsel, in which he stated that the laboratory had retained portions of Jerry's heart. In December 2006, counsel for Christus accompanied Dr. Wheeler as he conducted an ex parte inspection of Jerry's heart tissue.

17

On February 16, 2007, Carswell moved to strike the testimony of Dr. Wheeler and another defense expert, Dr. William Lowry, and to limit the testimony of other expert witnesses "as part of the remedy for Christus' spoliation of brain, body, blood, and bodily fluid evidence, as well as for its bad-faith conduct in diverting the Decedent's body away from the [HCMEO] for autopsy." Carswell argued that Christus spoliated evidence by "misdirecting the autopsy away from the Medical Examiner's Office," and, as a remedy, the trial court should preclude Christus from "challenging the results of the autopsy report and using anyone else other than Dr. Terrel[] to explain to the jury the autopsy and the findings."

Carswell also argued that the court should strike the expert testimony as a sanction because Christus violated the court's August 28, 2006 order when Dr. Wheeler and Christus's counsel viewed the heart tissue at St. Joseph in December 2006. Carswell also argued that sanctions were warranted because, despite stating that in its response to Carswell's 2005 request for "[a]ll tissues, fluids, specimens, and/or slides containing tissues or fluid in your possession concerning Jerry Carswell" that it "will supplement," Christus never provided such tissues, although it "began to leak out—after a Court hearing denying further testing of alleged heart tissue slides—that there may be a 'whole heart belonging to Jerry Carswell somewhere.'"

On October 9, 2007, the trial court denied Carswell's motion to strike. The trial court, however, included the following in the order:

> After considering the circumstances surrounding the disappearance of evidence and Defendant's failure to timely provide the same to Plaintiffs, the Court is of the opinion that Plaintiffs are hereby permitted to present evidence of Defendant's concealment, destruction, and/or adulteration of evidence at trial as [a] sanction for Defendant's conduct and the costs of trial preparation incurred by Plaintiffs as a direct result thereof.

On October 23, 2007, the trial court, at Christus's request, issued the following order clarifying its October 9, 2007 order:

> Plaintiffs are hereby permitted to present evidence, if any, of Defendants' concealment, destruction, and/or adulteration of evidence at trial. If Plaintiffs meet their burden of proof regarding Defendants' concealment, destruction, and/or adulteration of evidence, the Court will conduct an evidentiary hearing immediately after trial to determine the appropriate amount of attorney's fees available to Plaintiffs, if any, as sanction for the offending conduct.

At a hearing on November 5, 2007, counsel for Christus revealed that St. Catherine laboratory employee Tham Hoang had taken a sample from one of Jerry's blood draws—*not* the blood drawn during the Code Blue, which was apparently destroyed seven days after Dr. Terrel performed Jerry's autopsy, pursuant to St. Joseph's standard retention schedule—and stored it in the laboratory freezer. This sample was allegedly not discovered until October 2007 when Christus asked Hoang about policies concerning destruction of laboratory samples and she then remembered that she had taken this sample. The trial court

19

expressed its frustration with Christus's conduct, and, in response to defense counsel stating that he felt it was "an honest situation," the court responded, "I might have thought that back when we found the heart. I'm beginning to wonder now after we find the blood." When Christus's counsel sought "further guidance" regarding the situation, the trial court responded that it would "wait and see what [Carswell's counsel] has to file about that."

Carswell subsequently moved for sanctions, requesting that the trial court impose, among other sanctions, $600,000 in monetary sanctions, a spoliation inference, and a limitation on Christus to "utilization of only the autopsy report, death certificate and the expert testimony of the pathologist they utilized to conduct the autopsy, Dr. Jeffrey Terrel, to testify regarding cause, manner, and mechanism of death . . . ."

On March 13, 2008, the trial court granted Carswell's motion for sanctions. The trial court made the following findings and conclusions:

- Defendant Christus improperly concealed the heart tissue of Jerry Carswell in a Christus pathology laboratory;

- Defendant Christus improperly concealed blood serum belonging to Jerry Carswell under conditions rendering it scientifically and evidentiarily unreliable;

- Through concealment of Jerry Carswell's heart tissue and blood, Defendant Christus failed to timely supplement its response to Plaintiffs' First Request for Production, Request Number 17, in which Plaintiffs sought discovery of tissues,

fluids, specimens, and/or slides containing tissues or fluids belonging to Jerry Carswell;

- By hiring Dr. Thomas Wheeler on or about December 8, 2006 to conduct a second ex parte inspection upon the heart tissue of Jerry Carswell, Defendant Christus violated the Court's August 2006 ruling denying Defendant's Motion for Leave to inspect Mr. Carswell's heart tissue;

- Plaintiffs have been severely prejudiced by Defendant's improper concealment of critical physical evidence and ex parte inspections of heart tissue because the Court finds that such evidence, if fresh and properly preserved, could have been used to determine the cause, manner, and mechanism of the death of Jerry Carswell;

- The Court finds Defendant Christus' dilatory behavior to be (1) abusive to Plaintiffs, who have expended significant time and monetary resources developing their theory of the case without the benefit of spoliated heart and blood evidence, (2) in violation of the rules of discovery, as well as (3) a waste of the Court's time and resources;

- The Court further finds that prior sanctions related to Defendant's conduct have been unsuccessful in securing Defendant's compliance with the rules of discovery.

The trial court then imposed the following sanctions on Christus:[6]

- The Court hereby strikes any and all defense witnesses whose testimony stems from or relies upon ex parte inspection(s) of heart tissue belonging to Jerry Carswell;

- The Court hereby strikes any and all defense pleadings indicating that Jerry Carswell's death is cardiac-related;

---

[6] These sanctions were imposed by the Honorable Elizabeth Ray. Her successor, the Honorable Josefina Rendon, adopted the prior sanctions order on February 19, 2009. Judge Rendon was the judge for the trial, and, on January 10, 2011, she denied Christus's motion to vacate Judge Ray's March 13, 2008 sanctions order and her own February 19, 2009 order adopting that order.

21

- Defendant Christus is equitably estopped from disputing the conclusions in Jerry Carswell's autopsy report and death certificate;

- Because the Court finds that Plaintiffs have been severely prejudiced by Defendant Christus' spoliation of heart tissue and blood evidence, Plaintiffs are hereby entitled to a spoliation inference and the corresponding presumption that such evidence would have been unfavorable to Defendant Christus;

- Monetary sanctions in the amount of two hundred and fifty-thousand dollars ($250,000.00) to be paid from Defendant Christus to Plaintiffs within ten (10) days of the signing of this order.

Christus sought mandamus relief from these sanctions in this Court. We denied mandamus, holding that Christus failed to establish both a clear abuse of discretion and a lack of an adequate appellate remedy. *See In re Christus Health*, 276 S.W.3d 708, 709 (Tex. App.—Houston [1st Dist.] 2008, orig. proceeding).

Trial began on August 11, 2010. At trial, Question Number One of the written jury charge asked the jury whether "the negligence, if any, of CHRISTUS St. Catherine Hospital's nurses proximately cause the death of Jerry Carswell." The trial court included definitions of negligence, ordinary care, and proximate cause, as well as an "unavoidable accident" instruction and a spoliation instruction. The jury answered "no." With regard to Carswell's post-mortem claims, Question Number Eight asked, "Did CHRISTUS St. Catherine Hospital commit fraud against Linda Carswell in connection with obtaining Linda Carswell's consent for the autopsy to be performed on Jerry Carswell's body?" The jury answered "yes."

22

Question Number Nine asked whether a relationship of trust and confidence existed between St. Catherine and Linda Carswell—the jury answered "yes"—and Question Number Ten, which was conditioned on a "yes" answer to Question Number Nine, asked, "Did CHRISTUS St. Catherine Hospital fail to comply with its fiduciary duty to Linda Carswell in connection with obtaining Linda Carswell's consent for the autopsy to be performed on Jerry Carswell's body?" The jury answered "yes." Question Number Eleven asked whether the negligence, if any, of St. Catherine in connection with obtaining Linda Carswell's consent for the autopsy proximately caused injury to her. The jury answered "yes." In response to Question Number Twelve, which asked whether Christus, Dr. Terrel, or SJAP interfered with Carswell's right to possess and bury Jerry Carswell, the jury answered "no." The jury awarded Carswell $1,000,000 in compensatory damages and $1,000,000 in exemplary damages as a result of Christus's fraud.

The trial court entered an amended final judgment on March 29, 2011. Carswell elected to recover on the jury's finding of post-mortem fraud. The trial court entered judgment that Carswell take nothing against Christus on her medical negligence claim and interference with right of internment claim. The court also entered judgment that Carswell recover $1,000,000 from Christus in actual damages and $750,000 in exemplary damages, reduced from $1,000,000 pursuant to Civil Practice and Remedies Code section 41.008(b), on her post-mortem fraud

23

claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(b) (Vernon Supp. 2012) (limiting recovery of exemplary damages). The court awarded Carswell $279,863.76 in prejudgment interest, specifically stating that interest accrued at the rate of $136.99 per day and started accruing on the date Carswell initially filed her original petition, June 7, 2005. The court also awarded postjudgment interests and costs to Carswell, and it ordered the recovery of $267,890.02 in sanctions—which included accrued interest after Christus deposited $250,000 into the registry of the court—pursuant to the March 13, 2008, and February 19, 2009 sanctions orders.

## Sufficiency of the Evidence

In its first issue, Christus contends that we should reverse the trial court's judgment on Carswell's post-mortem fraud claim because the jury's finding on this claim is not supported by legally and factually sufficient evidence.

### A.    *Standard of Review*

When conducting a legal sufficiency review, we credit favorable evidence if a reasonable fact-finder could do so and disregard contrary evidence unless a reasonable fact-finder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex. App.—Houston [1st Dist.] 2007, no pet.). We consider the evidence in the light most favorable to the finding under review and we indulge every reasonable inference that would support the finding. *City of Keller*, 168 S.W.3d at 822. We sustain a no-evidence

24

contention only if: (1) the record reveals a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810; *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).

In a factual sufficiency review, we consider and weigh all of the evidence. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). When the appellant challenges a jury finding on an issue on which it did not have the burden of proof at trial, we set aside the verdict only if the evidence supporting the jury finding is so weak as to make the verdict clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176; *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 782 (Tex. App.—Houston [1st Dist.] 2011, no pet.). The jury is the sole judge of the witnesses' credibility; and it may choose to believe one witness over another. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). We may not substitute our judgment for that of the jury. *Id.* "Because it is the jury's province to resolve conflicting evidence, we must assume that jurors resolved all conflicts in

25

accordance with their verdict." *Figueroa v. Davis*, 318 S.W.3d 53, 60 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

### B.     Post-Mortem Fraud Claim

Question Number Eight asked the jury whether "CHRISTUS St. Catherine Hospital commit[ted] fraud against Linda Carswell in connection with obtaining Linda Carswell's consent for the autopsy to be performed on Jerry Carswell's body[.]"    Carswell alleged that Christus employees made three fraudulent misrepresentations to her that induced her to consent to the autopsy performed by St. Joseph:  (1) Patty Elam told her that the HCMEO would not accept the case and would not perform an autopsy because it had been told by St. Catherine personnel that Jerry's cause of death was renal failure; (2) Barbara Lazor told her that an autopsy performed by Christus would be "just like" and "the very same type of autopsy" as an independent forensic autopsy; and (3) Lazor told her that the autopsy would be a "complete" autopsy that would determine Jerry's cause of death.

To prevail on her post-mortem fraud claim, Carswell had to prove that: (1) Christus made a material misrepresentation that was false; (2) Christus knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) Christus intended to induce Carswell to act upon the representation;  and  (4)  Carswell  actually  and  justifiably  relied  upon  the

representation and thereby suffered injury. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001); *Perez v. DNT Global Star, L.L.C.*, 339 S.W.3d 692, 705 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

The Texas Supreme Court has defined "material" to mean that "a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). A pure expression of opinion is not a representation of material fact and thus cannot be the basis of a fraud claim. *Id.* at 337–38 (citing *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 163 (Tex. 1995)). Whether a statement is an actionable statement of fact or an opinion depends on the circumstances in which the statement is made, and "[s]pecial or one-sided knowledge may help lead to the conclusion that a statement is one of fact, not opinion." *Id.* at 338 (citing *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995)). Thus, "'[s]uperior knowledge by one party may also provide the occasion for fraud.'" *Id.* (quoting *Faircloth*, 898 S.W.2d at 277).

"[A] defendant who acts with knowledge that a result will follow is considered to intend the result." *Ernst & Young*, 51 S.W.3d at 579. To determine whether reliance on a misrepresentation is justifiable, we must "inquire whether, 'given a fraud plaintiff's individual characteristics, abilities, and appreciation of

27

facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part.'" *Grant Thornton L.L.P. v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (quoting *Haralson v. E. F. Hutton Grp., Inc.*, 919 F.2d 1014, 1026 (5th Cir. 1990)). "A person may not justifiably rely on a representation if there are 'red flags' indicating such reliance is unwarranted." *Id.* (quoting *Lewis v. Bank of Am. N.A.*, 343 F.3d 540, 546 (5th Cir. 2003)).

Here, Carswell testified that after she arrived at St. Catherine and learned that Jerry had passed away, she had a conversation with Patty Elam, the charge nurse for the day shift, who had also just arrived at the hospital. During the course of this conversation, Carswell asked Elam whether St. Catherine personnel had called the HCMEO because she wanted the HCMEO to conduct a forensic autopsy. Elam responded that the HCMEO had been notified of Jerry's death, but it would not accept the case and it would not perform an autopsy because it had been told by St. Catherine that Jerry's cause of death was renal failure. Elam denied making this statement to Carswell, and she testified that she played no role in contacting the HCMEO and that she did not discuss the HCMEO, the autopsy-consent form, or Jerry's cause of death with Carswell. She testified that she did not discuss Jerry's cause of death with anyone else, including other nurses, and she would not have said that he died of renal failure.

28

Furthermore, although Lightfoot testified concerning what she "would have told" the HCMEO when she called, she did not testify regarding what she actually told the contact employee concerning the circumstances surrounding Jerry's death. Lightfoot acknowledged that, based on the times reflected on the autopsy consent form, her conversation with the HCMEO could have lasted only about one minute. There is no indication of what, if anything, the HCMEO was told about the circumstances surrounding Jerry's death. Lightfoot testified, on cross-examination, that she was unaware of St. Catherine's policy concerning the handling of unexplained and unwitnessed deaths and that she was unaware of St. Catherine's autopsy policy because she never coordinated autopsies. Lightfoot denied telling the HCMEO employee that Jerry died of renal failure.

Despite Elam's contradictory testimony, Carswell's testimony is some evidence that Elam made the representation at issue. *See City of Keller*, 168 S.W.3d at 822 (holding that, in legal sufficiency review, we consider evidence in light most favorable to finding under review); *Golden Eagle Archery*, 116 S.W.3d at 761 (holding that jury is sole judge of credibility of witnesses and weight to be given to their testimony). Moreover, the evidence supporting the jury's implied finding that Elam made the representation at issue is not so weak that the jury's verdict is clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176.

29

### 1.    *Materiality*

Linda and Jordan Carswell both repeatedly testified that they wanted the HCMEO to investigate and conduct an autopsy because they knew that the HCMEO was a completely independent entity from St. Catherine and they felt that the HCMEO would be "more aggressive" in determining Jerry's cause of death. They also both testified that they repeatedly told St. Catherine personnel that they wanted someone to contact the HCMEO and that they repeatedly asked St. Catherine nurses whether the HCMEO had been contacted.    St. Catherine personnel thus knew that the Carswells wanted an independent pathology group, specifically, the HCMEO, to perform Jerry's autopsy.    Moreover, as Dr. Carter testified, the HCMEO exists, in part, to "protect and assist" non-forensic institutions like hospitals in determining the cause and manner of an unexplained death.    She agreed that hospitals are required to report unexplained and unwitnessed deaths to the HCMEO, and that, upon eliciting information about the death, the HCMEO determines whether it will investigate and conduct an autopsy.[7]

---

[7]    Code of Criminal Procedure article 49.25 enumerates the duties to be performed by medical examiners, and section 6(a)(8) states:

> Any medical examiner, or his duly authorized deputy, shall be authorized, and it shall be his duty, to hold inquests with or without a jury within his county, in the following cases:  When a person dies who has been attended immediately preceding his death by a duly licensed and practicing physician or physicians, and such physician or physicians are not certain as to the cause of death and are unable to certify with certainty the cause of death as required by Section

The Carswells expressed a desire to have the HCMEO perform the autopsy; thus, a "reasonable person would attach importance to" Elam's representation that the HCMEO would *not* accept the case because it had been told that Jerry died of renal failure and "would be induced to act on" this representation in ultimately allowing St. Catherine to arrange the autopsy itself.  *See Italian Cowboy*, 341 S.W.3d at 337 (defining materiality).

### 2.    *Falsity*

Lee Ann Lightfoot testified that she called the HCMEO to inform it of Jerry's death.  Although she did not explicitly testify regarding what she actually told the HCMEO contact person—she instead testified regarding what she "would have" told the HCMEO employee—and she could not remember if she told the HCMEO that Jerry died of natural causes, she unequivocally testified that she did *not* tell the HCMEO that Jerry's cause of death was renal failure.  Lightfoot also agreed that any conversation with the HCMEO would have lasted about a minute.  There is no record of what, if anything, the HCMEO was told about the circumstances surrounding Jerry's death, and the HCMEO did not have a record of

---

193.004, Health and Safety Code.  In case of such uncertainty the attending physician or physicians, or the superintendent or general manager of the hospital or institution in which the deceased shall have died, shall so report to the medical examiner of the county in which the death occurred, and request an inquest.

TEX. CODE CRIM. PROC. ANN. art. 49.25, § 6(a)(8) (Vernon Supp. 2012).

31

receiving a call from St. Catherine concerning Jerry's death. Therefore, there is some evidence that any representation that HCMEO officials were told that Jerry died of renal failure and that the office declined to accept the case on that basis is false. *See Ernst & Young*, 51 S.W.3d at 577 (requiring, for fraud claim, that defendant make material representation that was false).

### 3. Knowledge of Falsity or Reckless Disregard for the Truth

Concerning whether Elam made the representation knowing that it was false or made it recklessly without regard for whether it was true or false, although Elam denied making the statement at all, she also repeatedly testified that she was not involved in contacting the HCMEO and took no part in that phone call, that she did not know what had been told to the HCMEO, that she did not discuss Jerry Carswell's death with any of the other St. Catherine nurses, and that she did not know the cause of Jerry's death. The unrebutted testimony is that Lightfoot called the HCMEO and that Elam and Lightfoot did not discuss Lightfoot's conversation with the HCMEO official. Therefore, Elam did not know what, if anything, Lightfoot had told the HCMEO about the circumstances surrounding Jerry's death and his apparent cause of death. Furthermore, Lightfoot did not testify concerning what she actually said to the HCMEO, but she did unequivocally testify that she did not tell the HCMEO that Jerry had died of renal failure. Because there is some evidence that Elam was not involved with contacting the HCMEO and had no

32

knowledge of what was told to the HCMEO, but that she represented to Linda Carswell that the HCMEO had declined to take the case because it had been told that Jerry died of renal failure, we conclude that some evidence supports the jury's implicit conclusion that Elam made the representation to Carswell with, at least, reckless disregard for the truth of the representation.

### 4. *Intent to Induce Action*

Carswell contends that, in making the misrepresentation concerning what St. Catherine told the HCMEO, Christus intended to induce her into consenting to St. Catherine's handling of Jerry's autopsy. The trial court admitted a document entitled "Authorization for Autopsy," created by the CHRISTUS St. Catherine Hospital Patient Care Services division. This document states, "It is the policy of CHRISTUS St. Catherine that consent for autopsy must be obtained from the patient's next of kin." Carswell testified that Elam, who made the representation concerning what had been told to the HCMEO, was also involved with obtaining her signature on the autopsy-consent form.

St. Catherine nursing personnel knew that Carswell wanted the HCMEO to perform the autopsy, and they knew that they needed her consent for St. Catherine to handle the autopsy. It is a reasonable inference that, upon telling Carswell that the HCMEO would not investigate and would not perform an autopsy, Carswell would then agree to let St. Catherine complete the autopsy, which would not

33

actually be a forensic autopsy. *See City of Keller*, 168 S.W.3d at 822 (holding, in

legal sufficiency review, that we indulge every reasonable inference that supports

jury's finding). The jury could have reasonably concluded that Christus knew that

Carswell would consent to allowing St. Catherine to perform an autopsy if she

were told by St. Catherine personnel that the HCMEO declined the case. Thus,

there is evidence that Christus intended to induce Carswell to consent to the

autopsy by making misrepresentations concerning why the HCMEO declined the

case. *See Ernst & Young*, 51 S.W.3d at 579 ("[A] defendant who acts with

knowledge that a result will follow is considered to intend the result.").

### 5.   *Reliance and Injury*

The final element of a fraud claim requires Carswell to prove that she

actually and justifiably relied on the misrepresentation and thereby suffered

injury.[8] *See id.* at 577. When determining whether reliance is justifiable, we

consider "a fraud plaintiff's individual characteristics, abilities, and appreciation of

facts and circumstances at or before the time of the alleged fraud." *Grant

Thornton*, 314 S.W.3d at 923; *see also Koral Indus. v. Sec.-Conn. Life Ins. Co.*,

802 S.W.2d 650, 651 (Tex. 1990) (per curiam) ("Failure to use due diligence to

suspect or discover someone's fraud will not act to bar the defense of fraud to the

---

[8]   As Carswell points out, Christus does not challenge the sufficiency of the evidence concerning Carswell's mental anguish damages. We therefore do not address the testimony from Carswell and Dr. Kristin Kassaw, Carswell's psychiatrist, concerning her symptoms of mental anguish.

contract."); *Summers v. WellTech, Inc.*, 935 S.W.2d 228, 234 (Tex. App.—Houston [1st Dist.] 1996, no writ) ("It is not a defense to fraud that the defrauded person might have discovered the truth by the exercise of ordinary care.").

Here, at the time Christus made its representations, Carswell had just been informed that her husband had passed away unexpectedly. The St. Catherine nursing staff had greater knowledge of the policies and procedures surrounding the contacting of the HCMEO and the obtaining of consent for St. Catherine to do the autopsy. Carswell, who was not involved with the phone call to the HCMEO, if any such phone call was made, had no knowledge regarding what was said to the HCMEO about how Jerry died. Moreover, the relevant time for determining whether the reliance was justifiable is the time the plaintiff actually relies on the representation, which, in this case, would be when Carswell signed the autopsy consent form. Therefore, the facts that she later wrote a letter to Dr. Terrel asking him to retain all autopsy specimens and that she later discovered that St. Joseph, where Dr. Terrel performed the autopsy, is a Christus-affiliated hospital are irrelevant to the analysis of whether her reliance was justifiable. We conclude that, based on the surrounding circmstances, some evidence supports the jury's implicit conclusion that Carswell's reliance on the representation was justifiable. *See Grant Thornton*, 314 S.W.3d at 923.

35

Christus asserts that, to establish that its misrepresentations caused Carswell's mental anguish damages allegedly suffered as a result of the continued "uncertainty" over Jerry's cause of death, Carswell had to prove that an autopsy performed by the HCMEO or another independent pathologist would have discovered the "true" cause of death, that is, that the HCMEO, unlike Dr. Terrel, would have performed toxicological screenings to establish an adverse reaction to Demerol and Phenergan as the sole cause of death.

Whether an autopsy performed by the HCMEO would have established that Jerry died of an adverse drug reaction is irrelevant to the issue of causation in this fraud case. Carswell testified that she wanted an independent entity, such as the HCMEO, to perform the autopsy, but as a result of Christus's misrepresentation that the HCMEO had declined the case because it had been told that Jerry died of renal failure, Carswell agreed to allow Christus to handle the autopsy. Dr. Joye Carter, an expert witness for Carswell who had extensive experience as a medical examiner, including past experience as the chief Harris County Medical Examiner, testified that, if HCMEO officials had been properly informed about the circumstances surrounding Jerry's death, i.e., that he received large doses of Demerol and Phenergan within two hours of his death, the HCMEO would have accepted the case and would have run toxicology tests on Jerry's blood.

36

Regardless of what results the toxicology tests would have shown, the HCMEO, an independent entity with no connection to any Christus hospitals, was required by law to be alerted to the mysterious circumstances of Jerry's death, could not have refused to take the case if the circumstances were reported accurately to it, would have employed a forensic pathologist to conduct the autopsy, and would have been able to confirm or deny whether the medications played a role in Jerry's death. This is what Carswell wanted: an entity with no doubts about its independence from the treating hospital to tell her what had happened to her husband. Because Carswell was unequivocally told by St. Catherine employees that the HCMEO would not accept the case and perform an autopsy, she herself never sought a second opinion from the HCMEO, nor could she have done so, leading to her continued uncertainty regarding Jerry's cause of death and her continued mental anguish.

Dr. Kristin Kassaw, Carswell's psychiatrist, testified that Carswell, who was suffering from "complicated bereavement," was referred to Kassaw by her psychotherapist, who felt that medication was appropriate. Dr. Kassaw testified that Jerry's death was "completely unexpected" to Carswell, and she was left with "the question of 'why,'" which was exacerbated by learning, in the litigation process, "that people hadn't been completely honest and forthcoming with her at the time of [Jerry's] death." Dr. Kassaw stated that "understanding what happened

37

is an important part" of the grieving process and that "to have unanswered questions in your mind about what happened to your loved one leaves the grieving process open." Dr. Kassaw testified that it would be difficult to "tease out" the particular stressor that caused Carswell's anxiety and depression, but she still opined that, to a reasonable degree of medical certainty, Carswell suffered mental anguish as a result of Jerry's death "and the subsequent events" that contributed to her diagnosed anxiety and depression. We conclude that some evidence supports the jury's finding that Christus's misrepresentation caused Carswell to suffer injury.[9] *See Ernst & Young*, 51 S.W.3d at 577.

We hold that sufficient evidence supports the jury's finding that Christus committed fraud to induce Carswell into consenting to an autopsy, and, therefore, the trial court appropriately entered judgment in favor of Carswell on her post-

---

[9] Carswell alleged three specific fraudulent misrepresentations: (1) Elam's representation concerning what had been told to the HCMEO; (2) Lazor's representation that an autopsy conducted at St. Joseph would be "just like" and the "very same type of autopsy" as an independent forensic autopsy; and (3) Lazor's representation that the autopsy conducted by St. Joseph would be a "complete" autopsy that would determine Jerry's cause of death. The jury charge did not ask the jury to determine whether each specific statement constituted a fraudulent misrepresentation. Instead, it asked, "Did CHRISTUS St. Catherine Hospital commit fraud against Linda Carswell in connection with obtaining Linda Carswell's consent for the autopsy to be performed on Jerry Carswell's body?" Because we conclude that sufficient evidence supports the conclusion that the first statement—Elam's representation—constitutes a fraudulent misrepresentation, we need not analyze whether sufficient evidence supports the finding that the other two statements also constitute fraudulent misrepresentations.

38

mortem fraud claim.[10]  *See City of Keller*, 168 S.W.3d at 810, 822, 827; *Cain*, 709 S.W.2d at 176.

**Recast Health Care Liability Claim**

Christus also contends, in its first issue, that Carswell cannot recover on her post-mortem fraud claim because it is an improperly recast health care liability claim that is subject to the procedural requirements of Civil Practice and Remedies Code Chapter 74, such as a two-year statute of limitations and the applicable cap on damages.

A health care liability claim must be filed within two years from "the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or the hospitalization for which the claim is made is completed."  TEX. CIV. PRAC. & REM. CODE ANN. § 74.251(a) (Vernon 2011).  The Civil Practice and Remedies Code defines a "health care liability claim" as

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

---

[10]  Because we conclude that sufficient evidence supports the jury's finding on Carswell's post-mortem fraud claim, the claim on which she elected to recover, we need not address Christus's second issue concerning whether the judgment of the trial court can be affirmed on Carswell's post-mortem breach of fiduciary duty claim or her post-mortem negligence claim.

*Id.* § 74.001(a)(13) (Vernon Supp. 2012). "Health care" is defined as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." *Id.* § 74.001(a)(10). The Civil Practice and Remedies Code defines "medical care" as "any act defined as practicing medicine under Section 151.002, Occupations Code, performed or furnished, or which should have been performed, by one licensed to practice medicine in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement." *Id.* § 74.001(a)(19).

Whether a claim constitutes a "health care liability claim" under Chapter 74 depends on the underlying nature of the claim, and "artful pleading" does not alter that nature. *Yamada v. Friend*, 335 S.W.3d 192, 196 (Tex. 2010); *see also Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 854 (Tex. 2005) (noting, in holding that asserted causes of action constitute health care liability claims, that "[a]ll of [Rubio's] claims arise from acts or omissions that are inseparable from the provision of health care" and that "the gravamen of Rubio's complaint is the alleged failure of Diversicare to implement adequate policies to care for, supervise, and protect its residents who require special, medical care"); *Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 544 (Tex. 2004) ("If the act or omission alleged in the complaint is an inseparable part of the rendition of health care services, then the

40

claim is a health care liability claim."). We focus on the "essence of the claims" and consider "the alleged wrongful conduct and the duties allegedly breached." *Tex. Cypress Creek Hosp., L.P. v. Hickman*, 329 S.W.3d 209, 214 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). Courts generally characterize claims as health care liability claims if the claims implicate standards of medical care. *See Buchanan v. O'Donnell*, 340 S.W.3d 805, 810 (Tex. App.—San Antonio 2011, no pet.); *see also Pallares v. Magic Valley Elec. Coop., Inc.*, 267 S.W.3d 67, 71 (Tex. App.—Corpus Christi 2008, pet. denied) ("[I]n considering whether a claim is a health care liability claim, the court may consider whether proving the claim would require specialized knowledge of a medical expert.").

Christus argues that the gravamen of Carswell's post-mortem claims is that Christus "attempted to conceal the alleged cause of Mr. Carswell's death by improperly obtaining Mrs. Carswell's informed consent to the autopsy on Mr. Carswell . . . ." Christus cites several cases from the Texas Supreme Court and various intermediate courts of appeals for the proposition that informed consent claims are "health care liability claims" pursuant to Chapter 74 and, thus, are subject to the procedural requirements, such as statute of limitations, prescribed by that chapter. *See, e.g.*, *McKinley v. Stripling*, 763 S.W.2d 407, 409 (Tex. 1989) ("A cause of action for the failure of a doctor to fully inform a patient of the risks of surgery is a negligence cause of action. Recovery is governed by the Medical

41

Liability and Insurance Improvement Act of Texas [Chapter 74].”); *Theroux v. Vick*, 163 S.W.3d 111, 114 (Tex. App.—San Antonio 2005, pet. denied) (“The representations Theroux alleges all have to do with whether Vick’s selection of the surgical procedure and performance of it met the standard of care for doctors in such circumstances and whether he adequately disclosed the risks of the surgical procedure to her. These allegations are nothing more than Theroux’s attempt to recast her malpractice claim as a fraud claim.”).

Christus also relies upon a memorandum opinion from the Dallas Court of Appeals, *Swanner v. Bowman*, No. 05-02-00040-CV, 2002 WL 31478769 (Tex. App.—Dallas Nov. 7, 2002, pet. denied) (mem. op.). In *Swanner*, the deceased died after Bowman or a nurse at Bowman’s direction “injected [the deceased] with a substance that caused his immediate death.” *Id.* at *1. The defendant-hospital sent the deceased’s body to its own pathologist for an autopsy instead of to the county medical examiner, as the family requested. *Id.* The family did not assert any claims arising out of the hospital’s decision to send the body to its own pathologist. Instead, the family alleged that the injection given to the deceased was made without his consent or the consent of the family, and the family brought causes of action for murder, civil conspiracy, intentional infliction of emotional distress, wrongful death, and negligence. *Id.* at *1–2.

The Dallas Court of Appeals held that all of the family's claims "revolve[d] around the administration of a medication that was an inseparable part of Bowman's rendition of medical services." *Id.* at *2. The court concluded that the claims were "based on the breach of a standard of care applicable to a physician because they deal with duties owed by a physician to a patient and deal with what an ordinarily prudent physician would do under the same or similar circumstances." *Id.* The court also concluded that, although the family asserted a "murder" cause of action against the defendants, their cause of action was actually a wrongful-death claim, "which is included within the definition of a health care liability claim." *Id.* at *3.

The court reasoned that, regardless of how the family labeled their claim, they had to establish that Bowman "deviated from the standard of care applicable to the administration of the drug." *Id.* Although the family cast their claim as an intentional tort, because the "underlying nature of the claim is inseparable from a physician's rendition of medical services and treatment involving a departure from accepted standards of medical care, health care, or safety," the claim fell within the purview of the Medical Liability and Insurance Improvement Act. *Id.* The court further concluded that the family's claims for intentional infliction of emotional distress and civil conspiracy also fell within the Act because they "[arose] from the

43

same facts alleged as the intentional wrongful death claim and [sought] the same damages." *Id.* at *4.

In contrast, Carswell relies upon two memorandum decisions from the San Antonio and Fort Worth Courts of Appeals, *Salazar v. Dickey*, No. 04-08-00022-CV, 2010 WL 307852 (Tex. App.—San Antonio Jan. 27, 2010, pet. denied) (mem. op.), and *Hare v. Graham*, No. 2-07-118-CV, 2007 WL 3037708 (Tex. App.—Fort Worth Oct. 18, 2007, pet. denied) (mem. op.), respectively, for the proposition that her post-mortem fraud claim does not constitute a health care liability claim. In *Hare*, the plaintiff alleged that the defendant-doctor performed an unauthorized autopsy on her husband without her permission and that medical center employees "misled and intentionally deceived her regarding consent for an autopsy." 2007 WL 303778, at *1.

In determining that the plaintiff's claim did not constitute a health care liability claim, the Fort Worth Court of Appeals in *Hare* analyzed the statutory definitions of "health care liability claim," "health care," and "medical care" and noted that the definitions of "health care" and "medical care" both end with the phrase "the patient's care, treatment, or confinement." *Id.* at *3; *see also Salazar*, 2010 WL 307852, at *4 (adopting Fort Worth court's reasoning and holding that plaintiff's claims that doctor fraudulently signed death certificate without being present at death or performing autopsy did not constitute health care liability

claim). The court noted that Health and Safety Code section 313.002(8), part of the Consent to Medical Treatment Act, defined "patient" as "a person who is admitted to a hospital," which, according to the court, "clearly implies that a person must be alive in order to be a 'patient.'" *Hare*, 2007 WL 303778, at *3; *Salazar*, 2010 WL 307852, at *4. The court acknowledged its holding from a previous case that "a body was not a patient, nor was an autopsy a form of medical treatment" and reasoned that "the idea that a cadaver can be a 'patient' is, on its face, illogical." *Hare*, 2007 WL 303778, at *3 (citing *Putthoff v. Ancrum*, 934 S.W.2d 164, 171 (Tex. App.—Fort Worth 1996, writ denied)).

The Fort Worth court ultimately held that "a dead body is not a patient" and it concluded that "a body does not receive 'medical care, treatment, or confinement' after death." *Id.* The plaintiff's claim that the doctor performed an unauthorized autopsy on her husband and that medical center employees "misled and intentionally deceived her regarding consent for an autopsy" did not constitute a "health care liability claim" pursuant to Chapter 74. *Id.*; *see also Salazar*, 2010 WL 307852, at *4 ("Because Salazar's father was already dead at the time Dr. Ross allegedly departed from acceptable standards and practices, his father could not be a 'patient.' Nor could his father have received medical care, treatment, or confinement after his death.").

45

We follow the reasoning of *Hare* and *Salazar* and conclude that Carswell's post-mortem fraud claim is not a health care liability claim subject to Chapter 74. The gravamen of Carswell's post-mortem fraud claim does not concern the provision of health care to Jerry Carswell. Rather, the gravamen of the claim is that Christus employees, through their misrepresentations, fraudulently induced Carswell to consent to an autopsy performed by St. Joseph, the facility of Christus's choice, instead of an autopsy performed by the HCMEO or another independent pathologist. *Cf. Yamada*, 335 S.W.3d at 193–94 ("When the underlying facts are encompassed by provisions of the TMLA in regard to a defendant, then all claims against that defendant based on those facts must be brought as health care liability claims."). This claim does not implicate the standard of care in performing medical services to a patient, and the act complained of is not "an inseparable part of the rendition of medical services." *See Diversicare*, 185 S.W.3d at 848; *Garland Cmty. Hosp.*, 156 S.W.3d at 544; *Buchanan*, 340 S.W.3d at 810.

We overrule Christus's first issue.

## Calculation of Prejudgment Interest

In its third issue, Christus contends that the trial court erroneously calculated the amount of prejudgment interest to which Carswell was entitled. Christus contends that the trial court should have calculated prejudgment interest from

46

January 5, 2007, the date on which Carswell filed her post-mortem claims—the claims on which she prevailed at trial—instead of from June 7, 2005, the date on which Carswell filed her health care liability claim, on which she did not prevail at trial.

Texas Finance Code section 304.104 provides:

> [P]rejudgment interest accrues on the amount of a judgment during the period beginning on the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed and ending on the day preceding the date judgment is rendered. Prejudgment interest is computed as simple interest and does not compound.

TEX. FIN. CODE ANN. § 304.104 (Vernon 2006). Prejudgment interest is "compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998). Awarding prejudgment interest serves two purposes: (1) encouraging settlements and (2) expediting settlements and trials by removing incentives for defendants to delay without creating such incentives for plaintiffs. *Id.* at 529. Prejudgment interest is awarded to fully compensate the injured party, not to punish the defendant. *Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 809, 812 (Tex. 2006); *see also Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 486 (Tex. App.—Fort Worth 2004, no pet.) ("An award of prejudgment interest advances two ends: 1) achieving full compensation to

47

plaintiffs; and 2) expediting both settlements and trials."). We review a trial court's decision concerning the award of prejudgment interest for an abuse of discretion, giving limited deference to the trial court's application of the law to the facts. *Morales v. Morales*, 98 S.W.3d 343, 348 (Tex. App.—Corpus Christi 2003, pet. denied) (quoting *Marsh v. Marsh*, 949 S.W.2d 734, 744 (Tex. App.—Houston [14th Dist.] 1997, no pet.)); *see also Toshiba Machine Co. v. Am. SPM Flow Control, Inc.*, 180 S.W.3d 761, 785 (Tex. App.—Fort Worth 2005, pet. granted, judgm't vacated w.r.m.) ("The abuse of discretion standard applies to the trial court's factual findings as they relate to prejudgment interest; but the de novo standard applies to the trial court's application of the law to the facts.").

The Fourteenth Court of Appeals has recently concluded that when a plaintiff amends its pleadings to assert a claim for which it is ultimately entitled to prejudgment interest, prejudgment interest on that claim begins to accrue on the date of the amended petition raising that claim instead of on the date the plaintiff originally filed suit. *See I-10 Colony, Inc. v. Lee*, 393 S.W.3d 467, 480 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *Tex Star Motors, Inc. v. Regal Fin. Co.*, No. 14-05-00215-CV, 2012 WL 58945, at *13 (Tex. App.—Houston [14th Dist.] Jan. 10, 2012, no pet.).

In *Tex Star Motors*, the plaintiff, Regal Finance Co., originally filed suit on August 15, 2002, and asserted a claim for breach of a purchase agreement. 2012

48

WL 58945, at *12. Three months later, on November 15, 2002, Regal amended its petition to assert a claim for breach of an agreement to provide administrative and collection services, the claim on which it ultimately prevailed at trial. *Id.* The trial court determined that prejudgment interest began accruing on August 15, 2002, the date of Regal's original petition. *Id.* at *13.

The Fourteenth Court of Appeals noted in *Tex Star Motors* that the purposes of awarding prejudgment interest—full compensation to the plaintiff and expediting settlement and trial—are not "served by determining that prejudgment interest accrues before the date the defendant receives notice" of the claim. *Id.* In that case, Tex Star did not receive notice of the claim on which Regal ultimately recovered until November 15, 2002, the date of the amended petition. *Id.* Prior to this point in time, therefore, Tex Star could not have attempted settlement or made efforts to expedite trial on that claim. *Id.* Our sister court thus determined that the appropriate date for the accrual of prejudgment interest was the date of Regal's amended petition. *Id.*; *I-10 Colony*, 393 S.W.3d at 480 ("It would not be equitable to charge I-10 for prejudgment interest accruing on a claim before it received any notice of that claim."); *see also Thrift v. Estate of Hubbard*, 44 F.3d 348, 362 (5th Cir. 1995) (applying predecessor to section 304.104 and holding that because defendant could not settle claim prior to receiving notice of claim in amended complaint, district court properly used date of amended complaint to trigger

accrual of prejudgment interest); *Citizens Nat'l Bank*, 142 S.W.3d at 486–88 (following same rationale in analogous situation in which plaintiff filed suit against one defendant then filed separate suit against two other defendants eight months later).

Here, Carswell first filed her pre-mortem health care liability claims against Christus on June 7, 2005. She later amended her petition to assert her post-mortem claims against Christus on January 5, 2007. Carswell ultimately prevailed only on her post-mortem claims, but the trial court calculated the prejudgment interest award from the date she originally filed suit, not the date she filed her amended petition asserting the post-mortem claims. One of the purposes of allowing prejudgment interest awards is to encourage and expedite settlement of claims. *See Johnson & Higgins*, 962 S.W.2d at 529; *I-10 Colony*, 393 S.W.3d at 480; *Tex Star Motors*, 2012 WL 58945, at \*13; *Citizens Nat'l Bank*, 142 S.W.3d at 486. As the Fourteenth Court of Appeals pointed out in *I-10 Colony* and *Tex Star Motors*, a defendant cannot attempt to settle a claim until it has notice of the claim. 393 S.W.3d at 480; 2012 WL 58945, at \*13; *see also Citizens Nat'l Bank*, 142 S.W.3d at 388. Because Carswell did not assert her post-mortem claims, the only claims on which she prevailed at trial, until her third amended petition, we conclude that the trial court should have used the date of that petition—January 5, 2007—to calculate the prejudgment interest award.

50

We sustain Christus's third issue.

## Sanctions

Finally, in its fourth issue, Christus contends that we should vacate the trial court's sanctions awards against it because (1) it did not engage in any misconduct justifying the sanctions award, and (2) to the extent that it did engage in discovery-related misconduct, the trial court's sanctions award is not just because it is not supported by any evidence in the record.

### A. *Standard of Review and Sanctions Law*

We review a trial court's ruling on a motion for sanctions for an abuse of discretion. *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004); *Taylor v. Taylor*, 254 S.W.3d 527, 532 (Tex. App.—Houston [1st Dist.] 2008, no pet.). A trial court abuses its discretion when it acts without reference to any guiding rules and principles, and we reverse a trial court's ruling only if its action is arbitrary or unreasonable. *Cire*, 134 S.W.3d at 838–39 (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241, 242 (Tex. 1985)). A trial court does not abuse its discretion if it bases its decision on conflicting evidence and some evidence supports its decision. *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding); *Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620, 643 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). We make an independent inquiry of the entire record to determine whether the trial court abused its

discretion in imposing the particular sanctions. *Scott Bader, Inc. v. Sandstone Prods., Inc.*, 248 S.W.3d 802, 812 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (citing *Daniel v. Kelley Oil Corp.*, 981 S.W.2d 230, 234 (Tex. App.—Houston [1st Dist.] 1998, pet. denied)).

Trial courts use sanctions to assure compliance with the discovery rules and to deter those parties who might be tempted to abuse the discovery process in the absence of a deterrent. TEX. R. CIV. P. 215.2; *Cire*, 134 S.W.3d at 839; *Scott Bader*, 248 S.W.3d at 812 ("Rule of Civil Procedure 215.2 allows a trial court to enter 'just' sanctions for a party's failure to comply with a discovery order or request."). A trial court's sanction power is limited, however, in that the court "may not impose a sanction that is more severe than necessary to satisfy its legitimate purpose." *Cire*, 134 S.W.3d at 839 (citing *Hamill v. Level*, 917 S.W.2d 15, 16 (Tex. 1996)). In *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913 (Tex. 1991), the Texas Supreme Court established a two-part test for determining whether a sanctions award is "just." First, a direct relationship must exist between the offensive conduct and the sanction imposed, which means that the sanction must be "directed against the abuse and toward remedying the prejudice caused [to] the innocent party." *Cire*, 134 S.W.3d at 839 (quoting *TransAmerican*, 811 S.W.2d at 917). Second, the sanction must not be excessive, meaning that "[t]he punishment should fit the crime," and courts must consider the

availability of less-stringent sanctions and whether the less-stringent sanctions would fully promote compliance. *Id.* (quoting *TransAmerican*, 811 S.W.2d at 917); *Taylor*, 254 S.W.3d at 533 ("[A] sanction imposed should be no more severe than necessary to satisfy its legitimate purposes, which include securing compliance with discovery rules, deterring other litigants from similar misconduct, and punishing violators.").

## B. Propriety of Trial Court's Sanctions Order

### 1. Sanctionable Conduct by Christus

In its March 13, 2008, sanctions order, the trial court found, among other things, that Christus had improperly concealed Jerry's heart tissue, failed to supplement its response to Carswell's discovery request seeking production of "tissues, fluids, specimens, and/or slides containing tissues or fluids belonging to Jerry Carswell" in a timely manner, and violated the court's August 28, 2006 ruling denying Christus's motion for leave to inspect Jerry's heart tissue.

In July 2005, Christus responded that it "will supplement" its answer to Carswell's discovery request seeking production of Jerry's tissues. Christus presented evidence that it first learned in December 2005 that portions of Jerry's heart had been retained by Dr. Terrel. It alleged that it informed Carswell of this in March 2006 in a telephone call to her attorneys and by faxing the expert report of Dr. Wheeler, in which he referred to the retained samples. Carswell disputed this

allegation and instead argued that she did not receive notice of the retention until Dr. Terrel's deposition in October 2006. It is undisputed that Christus did not formally supplement its discovery response until December 2006. The trial court found that this conduct, among other conduct, was a basis for sanctions.

Texas Rule of Civil Procedure 193.5 provides that if a party learns that its response to written discovery was incomplete, it must amend or supplement its response. TEX. R. CIV. P. 193.5(a). The amendment or supplementation must be made "reasonably promptly after the party discovers the necessity for such a response." TEX. R. CIV. P. 193.5(b). A party who fails to timely supplement a discovery response may not introduce into evidence the material that was not timely disclosed. TEX. R. CIV. P. 193.6(a) (providing two exceptions to general rule: good cause for failure or failure would not unfairly surprise or prejudice opposing party); *see also* TEX. R. CIV. P. 193.6(b) (providing that burden of establishing exception to general rule of exclusion falls on party seeking admission of evidence); TEX. R. CIV. P. 215.2(b) (allowing trial court to sanction party for failing to comply with proper discovery request). The trial court may impose monetary sanctions on a party for its failure to supplement its discovery responses in a timely manner. *See PR Invs. & Specialty Retailers, Inc. v. State*, 251 S.W.3d 472, 480 (Tex. 2008).

The trial court had before it conflicting evidence concerning when Carswell received notice that Dr. Terrel had retained portions of Jerry's heart. The trial court was therefore within its discretion to determine that Carswell did not receive notice of this retention until Dr. Terrel's deposition in October 2006, fifteen months after Christus originally answered Carswell's discovery requests and nine months after Christus discovered that Dr. Terrel had retained Jerry's heart tissue. *See In re Barber*, 982 S.W.2d at 366 (holding that trial court does not abuse its discretion when there is conflicting evidence and some evidence supports decision).

Furthermore, Christus moved the trial court to allow it to inspect portions of Jerry's heart tissue. The trial court denied this motion on August 28, 2006. It is undisputed that Dr. Wheeler conducted an ex parte examination of this tissue on December 8, 2006. The trial court found that this action was a basis for sanctions.

By denying Christus's request for inspection and further testing of Jerry's heart, the trial court essentially prevented further discovery on this issue. Christus then disregarded this discovery order by allowing Dr. Wheeler to conduct his examination. Violation of a trial court's prior discovery order is sanctionable pursuant to Rule 215.2(b). *See* TEX. R. CIV. P. 215.2(b); *see also Hernandez v. Mid-Loop, Inc.*, 170 S.W.3d 138, 144 (Tex. App.—San Antonio 2005, no pet.) (holding that trial court has discretion to impose sanctions when party fails to obey

court order to comply with proper discovery requests); *F.N. Fausing Trading ApS v. Estate of Barbouti*, 851 S.W.2d 314, 318 (Tex. App.—Houston [1st Dist.] 1992, writ denied) ("If a party refuses to obey a court order or disregards some mandatory rule of procedure, before imposing death penalty sanctions of dismissal, the trial court should impose some sanction less severe and oppressive.").

We conclude that the trial court did not abuse its discretion when it determined in its March 13, 2008 order that Christus had engaged in sanctionable conduct.

### 2. Non-monetary Sanctions

The trial court imposed the following non-monetary sanctions: (1) it struck all of Christus's witnesses whose "testimony stems from or relies upon ex parte inspection(s) of heart tissue belonging to Jerry Carswell"; (2) it struck all defensive pleadings indicating that Jerry's death was cardiac-related; (3) it equitably estopped Christus from disputing the conclusions in Jerry's autopsy report and death certificate; and (4) it provided that Carswell was entitled to a spoliation inference and presumption that the heart and blood evidence would have been unfavorable to Christus. Christus argues that these sanctions were not just, but instead were excessive and unsupported by any evidence.

Carswell argues that the imposition of these particular sanctions was harmless because the evidence that these sanctions prohibited from being

56

introduced at trial—evidence that Jerry Carswell's cause of death was cardiac related—was relevant only to Carswell's health care liability claims, upon which *Christus* prevailed at trial, and was not relevant to Carswell's post-mortem claims. We agree with Carswell.

Introduction of cardiac-related evidence would not change our conclusion that sufficient evidence supports Carswell's post-mortem fraud claim. Regardless of whether this evidence was introduced, Carswell still presented evidence that Elam made a material, false misrepresentation with at least reckless disregard for the truth when she told Linda Carswell that Christus had contacted the HCMEO and that the HCMEO had declined to accept the case for an autopsy because it had been told that Jerry died of renal failure. The jury could reasonably infer that this statement was made to induce Carswell to consent to an autopsy handled by St. Catherine. Even if Dr. Terrel had been allowed to testify that he determined that Jerry died of a cardiac-related issue, the evidence still reflects that Carswell was dissuaded, as a result of Christus's fraudulent misrepresentations, from seeking a second opinion regarding Jerry's cause of death from the HCMEO, an independent office of forensic pathologists which, unlike Dr. Terrel, would have run toxicology screenings on Jerry's blood, as Carswell specifically requested, and would have been able to confirm or deny Carswell's theory that Jerry's death was medication related.

Christus, therefore, has not established that the trial court's imposition of non-monetary sanctions caused it any harm with respect to the jury's finding on Carswell's post-mortem fraud claim.

### 3. Monetary Sanctions

The trial court also awarded Carswell "[m]onetary sanctions in the amount of [$250,000]." The trial court's order did not specify whether this amount corresponded to the amount of attorney's fees and expenses that Carswell had incurred in response to Christus's discovery misconduct, and it did not label the award as an award of attorney's fees.

Texas Rule of Civil Procedure 215.2 allows a trial court to require the party failing to comply with proper discovery requests to pay "the reasonable expenses, including attorney fees, caused by the failure" and it also allows the trial court to "make such orders in regard to the failure as are just." TEX. R. CIV. P. 215.2(b)(8); *see also Braden v. S. Main Bank*, 837 S.W.2d 733, 740 (Tex. App.—Houston [14th Dist.] 1992, writ denied). Monetary sanctions are appropriate to prevent a party from taking unjust advantage of another party. *See Braden v. Downey*, 811 S.W.2d 922, 930 (Tex. 1991) (orig. proceeding). In considering what amount of monetary sanctions are appropriate, the court should consider the prejudice that the objectionable conduct has caused the opposing party. *Id.* at 929.

When a monetary sanction awarded pursuant to Rule 215 "is not tied to any evidence in the record and the basis of calculating the amount is unknown, the sanction constitutes an impermissible arbitrary fine." *Stromberger v. Turley Law Firm*, 251 S.W.3d 225, 226–27 (Tex. App.—Dallas 2008, no pet.) (citing *Ford Motor Co. v. Tyson*, 943 S.W.2d 527, 535 (Tex. App.—Dallas 1997, orig. proceeding)); *S. Main Bank*, 837 S.W.2d at 741 ("We hold that when a trial court assesses a monetary sanction, there must be some evidence in the record linking the amount awarded to harm actually suffered by the party seeking sanctions."); *see also Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 187 (Tex. 2012) ("Sanctions for discovery abuse should not be dispensed as arbitrary monetary penalties unrelated to any harm."). Arbitrary fines "are not susceptible to meaningful review." *Stromberger*, 251 S.W.3d at 227. When we review a trial court's sanctions order for an abuse of discretion, "we must be able to determine not only that the trial court's decision to sanction the conduct at issue was proper, but that the sanction the trial court chose was just." *Id.*; *see also TransAmerican*, 811 S.W.2d at 917 (holding that, for sanction to be just, sanction must be directed against particular abuse and toward remedying prejudice caused by misconduct).

Absent some evidence supporting the amount of the monetary sanction or some basis for calculating the amount, we have no way to determine whether the amount of the sanction is excessive. *See Stromberger*, 251 S.W.3d at 227; *see also*

59

*IFC Credit Corp. v. Specialty Optical Sys., Inc.*, 252 S.W.3d 761, 773 (Tex. App.—Dallas 2008, pet. denied) ("The absence of an explanation as to how the trial court determined both the monetary and the non-monetary sanctions is inadequate."). When the trial court imposes a monetary sanction, "the sanctionable conduct alone does not prescribe the amount of the sanction." *Stromberger*, 251 S.W.3d at 227. "To review the decision of the amount of the monetary sanction imposed by examining *only* the conduct giving rise to the sanction would permit a 'wavering standard of subjectivity' unrestrained by law or statute." *Id.* (quoting *Tyson*, 943 S.W.2d at 536); *see also Para-Chem S., Inc. v. Sandstone Prods., Inc.*, No. 01-06-01073-CV, 2009 WL 276507, at *11–12 (Tex. App.—Houston [1st Dist.] Feb. 5, 2009, pet. denied) (mem. op.) ("The record does not reveal how the trial court arrived at the amount of the $250,000 sanction levied against Para-Chem nor does it contain evidentiary support for the $250,000 sanction. . . . We can determine no reason why the trial court chose to impose a $250,000 sanction rather than some other amount.").

Here, in the March 13, 2008 sanctions order, the trial court imposed a "monetary sanction" against Christus in the amount of $250,000. The trial court did not explain its rationale as to why it imposed this amount as a monetary sanction, and the record does not contain any evidence supporting the award of this particular amount as a sanction, such as, for example, evidence of the amount of

60

attorney's fees and expenses that Carswell incurred in response to Christus's discovery-related actions.[11] Christus's discovery conduct alone does not justify the amount of the sanction. *See Stromberger*, 251 S.W.3d at 227 (holding that reviewing monetary sanctions award by looking solely to misconduct involved "would permit a 'wavering standard of subjectivity'"). Because the record contains no evidence supporting an award of $250,000 as a monetary sanction, we have no way to determine whether this sanction is just or excessive. *See id.*; *see also TransAmerican*, 811 S.W.2d at 917 (requiring sanction to be directed against particular abuse and toward remedying prejudice caused by conduct and requiring sanction to "fit the crime"); *Hanley v. Hanley*, 813 S.W.2d 511, 521 (Tex. App.— Dallas 1991, no writ) ("Nothing in the record shows any connection between the

---

[11] Carswell characterizes this sanction as "monetary costs . . . in the form of attorney's fees" and cites our decision in *Scott Bader, Inc. v. Sandstone Prods., Inc.*, 248 S.W.3d 802 (Tex. App.—Houston [1st Dist.] 2008, no pet.), for the proposition that supporting evidence is not required for the trial court to award attorney's fees as a sanction. We first note that the trial court's March 13, 2008 sanctions order does not provide that the $250,000 award is to encompass Carswell's attorney's fees and expenses. Instead, this award is merely designated "monetary sanctions." By contrast, in *Scott Bader*, Sandstone requested that the trial court award attorney's fees as sanctions and it attached the affidavit of one of its attorneys who stated the total fees and expenses that Sandstone had incurred as a result of Scott Bader's discovery abuse. *Id.* at 816. On appeal, Scott Bader challenged the sanctions award and argued that the affidavit did not support the award when there was no basis for determining that the fees incurred were necessary and reasonable. *Id.* We noted, "When attorney's fees are assessed as sanctions, no proof of *necessity or reasonableness* is required." *Id.* at 817 (emphasis added). We did not hold that a trial court may award attorney's fees as sanctions in the absence of any evidence supporting the particular amount assessed.

61

$50,000 awarded and any harm suffered by appellee as a result of the alleged discovery abuse. The record does not reflect that $50,000 was anything more than an arbitrary amount that was requested by Friedman and awarded by the trial court.").

Carswell cites several cases for the proposition that, when an appellate court determines that a sanctions award is erroneous, the proper disposition is to remand the sanctions award to the trial court for reconsideration. *See, e.g.*, *Graves v. Tomlinson*, 329 S.W.3d 128, 150–52 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (remanding because court could not determine which portion of sanctions award was attributable to non-discovery-related conduct and could not evaluate *TransAmerican* factors on record before it); *see also Low v. Henry*, 221 S.W.3d 609, 621–22 (Tex. 2007) (remanding "in the interest of justice" to allow parties to present evidence responsive to guidelines that court delineated in that opinion for sanctions imposed under Civil Practice and Remedies Code Chapter 10). However, none of the cases cited by the parties allowing for remand involve the factual situation presented here, in which the trial court imposed an arbitrary monetary sanction against Christus in an amount that has no evidentiary support in the record.

This Court and our sister courts that have reviewed awards of these sanctions have uniformly held that when no evidence supports the amount of the

monetary sanction imposed, the proper action is to either vacate or render judgment that the party take nothing on that particular sanction award. *See Para-Chem S.*, 2009 WL 276507, at \*13; *Stromberger*, 251 S.W.3d at 227; *Tyson*, 943 S.W.2d at 536; *see also S. Main Bank*, 837 S.W.2d at 741–42 (deleting improper sanction award and affirming trial court judgment as modified). Under these factual circumstances, in which Carswell failed to offer legally sufficient evidence to support the $250,000 monetary sanction award, we decline to remand this award to the trial court for reconsideration. *Cf. Dolgencorp of Tex. v. Lerma*, 288 S.W.3d 922, 929 (Tex. 2009) ("Generally, if an appellate court holds there is legally insufficient evidence to support a judgment after a trial on the merits, the proper disposition is to reverse and render judgment).

We therefore hold that the trial court erroneously assessed $250,000 as a monetary sanction against Christus, and we vacate this sanction award.

We sustain Christus's fourth issue in part.

## Conclusion

We vacate the $250,000 sanction award against Christus. We further modify the judgment of the trial court to reflect that Carswell is entitled to $211,512.56 in prejudgment interest, and we affirm the judgment as modified. All pending motions are dismissed as moot.

 

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Brown.