CHRISTUS HEALTH GULF COAST (As an Entity, d/b/a CHRISTUS St. Catherine Hospital, and Formerly d/b/a CHRISTUS St. Joseph Hospital), Petitioner and Cross–Respondent

v.

Linda CARSWELL, Respondent and Cross–Petitioner

NO. 14–0362

Supreme Court of Texas.

Argued November 13, 2015

OPINION DELIVERED: May 20, 2016

Randall Shirres Richardson, Robert J. Swift, Warren Szutse Huang, Fulbright & Jaworski LLP, Houston, TX, for Petitioner.

Carl D. Shaw, Shaw Law, David W. Holman, The Holman Law Firm PC, James C. Marrow, Jennifer Bruch Hogan, Richard P. Hogan Jr., Hogan & Hogan, Neil C. McCabe, The McCabe Law Firm, Houston TX, Michael L. O'Brien, Mike O'Brien, P.C., Washington TX, for Respondent.

JUSTICE JOHNSON delivered the opinion of the Court.

This matter originated as a claim that CHRISTUS St. Catherine Hospital and others committed medical malpractice causing a patient to die in the hospital. The pleadings were eventually amended to add claims that the hospital took post-mortem actions to cover up the malpractice, including failing to properly notify the county medical examiner of the patient's death and improperly obtaining the widow's consent for a private autopsy. The jury did not find against the hospital on the malpractice claim, but found that it improperly obtained the widow's consent and awarded damages on that claim.

Among the issues presented is whether claims that the hospital improperly obtained approval from the decedent's widow for a private autopsy were health care liability claims. The trial court concluded they were not. It rendered judgment on the verdict as to that claim and included in the judgment monetary sanctions previously assessed against the hospital for pre-trial discovery abuse. The court of appeals affirmed as to the damages award but reduced the amount of prejudgment interest and vacated the discovery sanctions.

We address only three issues because they are dispositive: (1) were the claims based on the hospital's post-mortem actions health care liability claims; (2) if so, were they barred by limitations because they were not asserted until over three years after the operative facts took place; and (3) did the court of appeals err by reversing and rendering as to the discovery sanctions. We answer, respectively, Yes, Yes, and No. Based on those answers, we reverse in part, affirm in part, and render judgment for the hospital.

## I. Background

Jerry Carswell was admitted to CHRISTUS St. Catherine Hospital in Katy on January 19, 2004, complaining of severe pain in his right side. His attending physician, Dr. Paul Cook, prescribed narcotics to help with the pain, but Carswell reacted adversely to them and they were discontinued. Late in the evening of January 21 and the early morning of January 22, Carswell began experiencing severe pain again. Dr. Cook's associate, Dr. Christina Pramudji, prescribed pain medication, which the hospital nurses administered early in the morning of January 22. Later that morning, Carswell was found lying across his bed unresponsive and without a pulse. Emergency code procedures were initiated, but attempts to resuscitate him were unsuccessful. Because of the circumstances, Dr. Pramudji directed that a complete autopsy be performed.

Hospital personnel called Carswell's wife, Linda, and asked her to come to the hospital. When she arrived with her adult son, Jordan, Dr. Pramudji and Nurse Lee Anne Lightfoot told them that Carswell had passed away. Linda testified that she asked several people at the hospital what happened but was unable to find anyone who would give her more details about her husband's death than that he died in his sleep.

Upon hearing of Carswell's death, Barbara Lazor, the director of acute care services at St. Catherine, went to Carswell's room to speak with Linda. According to Linda, she told Lazor she wanted an autopsy because she wanted to know what happened; she wanted the autopsy performed somewhere other than at St. Catherine, such as at the Harris County Medical Examiner's Office (HCMEO); and Lazor said St. Catherine would contact the HCMEO. Lazor, on the other hand, testified that although she offered condolences to Linda, they did not discuss an autopsy; by the time Lazor arrived at the hospital that morning, the HCMEO had already been contacted; and she neither contacted the HCMEO nor was involved in obtaining Linda's consent for the autopsy. According to Linda, Nurse Patricia Elam said that the HCMEO did not take the case and would not be performing an autopsy or investigating. Linda testified that based on Elam's statement, she signed a Consent for Postmortem Procedures form provided by the nurses and checked the box for a complete autopsy with no restrictions. The form authorized doctors performing the autopsy to remove, test, and retain organs or tissues from the body.

Carswell's autopsy was performed at St. Joseph Hospital, a CHRISTUS facility, as was specified on the consent form. Dr. Jeffrey Terrel, a member of SJ Associated Pathologists, L.C., an independent group of pathologists that contracted with St. Joseph to do autopsies, performed it. Dr. Terrel was provided with Carswell's medical records, including the consent form signed by Linda and a blood sample taken from Carswell during the emergency code procedure (code blood). He testified that it was within his discretion as the physician pathologist to determine what needed to be done during the autopsy. One decision he made was that toxicology screening would not be performed on the code blood based on Carswell's medical history as documented in the medical records. Dr. Terrel issued a preliminary autopsy report on January 26, 2004. However, he needed to perform more tissue testing before he could issue a final report, so he retained approximately one-third of Carswell's heart for further study. Dr. Terrel testified that he was not required to, nor did he, notify anyone that he retained some of Carswell's tissues.

After she received the preliminary report, Linda was not satisfied that it showed the true cause of her husband's death and directed the hospital to preserve the autopsy specimens for further consideration. Dr. Terrel interpreted Linda's instructions as requiring him to stop testing tissue he had retained because testing would have destroyed portions of it. As a result, and without fully completing the autopsy, he submitted "anatomic findings" to Dr. Cook so Dr. Cook could determine the cause of death. Although Dr. Cook listed the manner of death on the death certificate as "natural," Linda testified that when she spoke with him about the death certificate he seemed unsure of the cause of death.

On June 7, 2005, Linda, individually and as representative of Carswell's estate, together with her adult sons Robert and Jordan (collectively, the Carswells), sued CHRISTUS Health and CHRISTUS Health Gulf Coast doing business as CHRISTUS St. Catherine Hospital. Their pleading was short and direct. It alleged that they previously provided notice to the defendants "pursuant to Tex. Civ. Stat. Ann. § 74.051, (2004), that Plaintiffs intended to assert a health care liability claim arising out of the medical care rendered to Jerry Carswell." The pleading outlined as "Facts" that Carswell was admitted to and treated in St. Catherine

until he was found unresponsive at 5:15 a.m. on January 22, at which time it was "too late." The petition alleged that "This action arises out of the medical malpractice committed by CHRISTUS that ultimately resulted in the death of Jerry L. Carswell on January 22, 2004," and set out acts and omissions of the hospital that were allegedly "medical negligence, which proximately led to the death of Jerry L. Carswell." Finally, the petition alleged "that the Defendants' conduct and omissions constituted, among other things, medical malpractice, negligence, gross negligence, negligence per se, malice, fraud, and breach of express and implied warranties and breach of contract." The damages sought were those accruing up until, and resulting from, Carswell's death. There was no mention in the pleadings of post-mortem conduct or omissions, except for references to attempts to resuscitate Carswell.

On March 21, 2006, the Carswells filed a First Amended Original Petition in which they added Drs. Pramudji and Cook as defendants, along with their practice group, Memorial Urology Associates, P.A. The Carswells continued to assert that "This action arises out of the medical malpractice committed by all Defendants that ultimately resulted in the death of Jerry L. Carswell on January 22, 2004." The Carswells filed a Second Amended Original Petition on October 31, 2006, naming the same plaintiffs and defendants. The petition expanded the allegations of negligence, but continued to specify that the family's claims were for medical malpractice that proximately caused Carswell's death.

On January 5, 2007, almost three years after Carswell's death, the Carswells filed their Third Amended Original Petition, which included, for the first time, allegations of conduct by hospital nurses and employees that occurred after Carswell's death and claims of damages from that conduct. The pleadings had sections entitled "VI. Medical Malpractice Facts," "VII. Wrongful Death and Survival Causes of Action," "VIII. Post–Mortem Facts," and "IX. Post–Death, Non–Medical Liability and Insurance Improvement Act Causes of Action." The Medical Malpractice Facts section set out more detail than did the prior pleadings as to pre-mortem conduct by hospital personnel, but did not allege any post-mortem facts beyond the failed attempts to resuscitate Carswell. The Wrongful Death and Survival Causes of Action section specified that the Carswells were asserting "wrongful death, survival, and medical malpractice causes of action against Defendants." In the Post–Mortem Facts section, the Carswells made allegations about conduct and statements that took place after resuscitation attempts on Carswell ended. The section began with the allegation that Linda and her son Jordan "were called back to the hospital after Mr. Carswell's death" and "were informed about the shocking and unexpected turn of events." After that followed allegations in nineteen separately numbered paragraphs detailing post-mortem interactions between the family, doctors, nurses, and hospital personnel. That section of the pleadings was followed by section "IX. Post–Death, Non–Medical Liability and Insurance Improvement Act Causes of Action," in which CHRISTUS Health, CHRISTUS St. Catherine Hospital, and CHRISTUS St. Joseph Hospital (collectively, CHRISTUS), three pathologists newly named as defendants, and SJ Associated Pathologists were labeled "Post–Mortem Defendants." The Carswells asserted "causes of action" against the post-mortem defendants "based on [defendants'] conduct after the death of Carswell." The Carswells did not serve any additional expert reports in connection with the amended pleadings.

CHRISTUS responded, in part, by seeking summary judgment because the claims for post-mortem conduct were recast health care liability claims (HCLCs) and were barred by the Act's two year limitations provision. The trial court denied the motion as to the new claims.

Pursuant to motions filed by the Carswells for discovery abuse sanctions, the trial court imposed trial sanctions on CHRISTUS. Those included striking certain defensive pleadings, precluding CHRISTUS from disputing conclusions in the autopsy report and death certificate, giving a spoliation instruction in the jury charge as to certain evidence, and imposing $250,000 in monetary sanctions against CHRISTUS.

The segregation in the Carswells' pleadings of claims for pre-mortem conduct (pre-mortem claims) from claims for post-mortem conduct (post-mortem claims) was maintained through several more pleading amendments and through trial. The first jury question asked if the negligence of CHRISTUS nurses proximately caused Carswell's death. The jury answered "No," and did not answer questions two through seven, which addressed damages resulting from his death. Questions eight through twenty-one asked about CHRISTUS's post-mortem actions in obtaining Linda's consent for an autopsy, interfering with her right to possess and bury Carswell's body, and her damages from those actions. The jury found that CHRISTUS did not interfere with her right to possess and bury Carswell's body. However, it found that CHRISTUS acted negligently, committed fraud, and breached its fiduciary duty to her in connection with obtaining her consent for the autopsy to be performed. The jury awarded actual and exemplary damages.

The trial court denied CHRISTUS's post-trial re-assertion that the post-mortem claims were barred because they were recast HCLCs and rendered judgment for the Carswells pursuant to their election to recover on the fraud claim. It reduced the jury's exemplary damage finding in accordance with statutory limits.

CHRISTUS appealed. The court of appeals affirmed, sustaining the trial court's decision that the Carswells' post-mortem claims were not HCLCs. 433 S.W.3d 585, 591 (Tex.App.—Houston [1st Dist.] 2013). However, it vacated the monetary sanctions. *Id.* at 615. CHRISTUS filed a motion for partial rehearing en banc. *Id.* at 618–19. The motion was denied, with three justices dissenting on the grounds that the fraud claim was an HCLC and should have been dismissed because it was based on "professional or administrative services directly related to health care." *Id.* at 622–25 (Bland, J., dissenting from denial of en banc reconsideration).

In this Court, CHRISTUS, in part, contends that the Carswells' fraud claim is an HCLC, presenting the position advanced by the dissenting justices in the court of appeals—that the claim is based on "professional or administrative services directly related to health care." *See* Tex. Civ. Prac. & Rem. Code § 74.001(a)(13). CHRISTUS's argument focuses on the fact that the Carswells' post-mortem claims asserted that the hospital tried to cover up its malpractice by failing to obey the law and fraudulently obtaining Linda's consent to an autopsy.[1] That being so, CHRISTUS maintains, there is a direct relationship between the alleged medical malpractice and the claims that CHRISTUS employees obtained Linda's consent to the autopsy by fraud.

---

1. The Carswells do not contend that the results of the autopsy would have been different if it had been performed by the medical examiner.

The Carswells respond that because neither the hospital nor Linda had authority to go forward with an autopsy without first contacting the HCMEO and making disclosures required by law, the autopsy was necessarily "separable from health care" and "separated from health care providers" so it could not have been "an inseparable or integral part of the rendition of health care." *See Tex. W. Oaks Hosp., L.P. v. Williams,* 371 S.W.3d 171, 180 (Tex.2012). They further argue that Carswell ceased to be a patient of CHRISTUS after his death, so the autopsy is not medical care or health care. By cross-petition, the Carswells ask for reinstatement of the monetary sanctions against CHRISTUS. They argue that the sanctions did not constitute an arbitrary fine as the court of appeals concluded, but rather were based on the "significant time and monetary resources" the family and trial court were required to expend as a result of CHRISTUS's failure to timely and properly produce discoverable evidence. Alternatively, they argue that if the monetary sanctions are not restored, then the issue should be remanded to the trial court for further proceedings.

## II. Discussion

### A. Is the Post-mortem Fraud Claim an HCLC?

When construing a statute, our goal "is to determine and give effect to the Legislature's intent" beginning with the "plain and common meaning of the statute's words." *Tex. W. Oaks,* 371 S.W.3d at 177 (internal quotation omitted). Whether a claim is an HCLC under the Act is a question of law that we review de novo. *Id.* In determining the question, we examine the underlying nature and gravamen of the claim, rather than the way it is pleaded. *Garland Cmty. Hosp. v. Rose,* 156 S.W.3d 541, 543 (Tex.2004).

Section 74.001(a)(13) of the Act defines "health care liability claim" as

a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or *professional or administrative services directly related to health care,* which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13) (emphasis added).

#### 1. Professional or Administrative Services

The Act defines "professional or administrative services" as

those duties or services that a physician or health care provider is required to provide as a condition of maintaining the physician's or health care provider's license, accreditation status, or certification to participate in state or federal health care programs.

TEX. CIV. PRAC. & REM. CODE § 74.001(a)(24). A hospital's license may be suspended or revoked for failing to comply with Health and Safety Code requirements or Administrative Code requirements. *See* TEX. HEALTH & SAFETY CODE § 241.053; 25 TEX. ADMIN. CODE § 133.121. The Carswells' claims against CHRISTUS implicate such requirements.

First, beginning with their Third Amended Original Petition and carrying through their live trial pleadings, the Carswells alleged that given the circumstances of Carswell's death, CHRISTUS was required by law to contact the HCMEO and request an inquest, which it did not do. *See* TEX. CODE CRIM. PROC. art. 49.25, § 6(a)(8). Instead, it fraudulently obtained Linda Carswell's written permission

for a private autopsy in an associated medical facility. *See* TEX. CODE CRIM. PROC. arts. 49.32(a), 49.35. Second, they alleged that Carswell's body should not have been moved without permission of the HCMEO. *See* TEX. CODE CRIM. PROC. art. 49.25, § 8. Those positions are reprised in the Carswells' brief to this Court. By these claims, the Carswells alleged CHRISTUS violated duties imposed on it by the Code of Criminal Procedure due to its status as a licensed health care provider. Violation of these duties by the hospital could result in its licenses being suspended or revoked. TEX. CODE CRIM. PROC. art. 49.25, § 14 (declaring violation of article 49.25 to be illegal); TEX. HEALTH & SAFETY CODE § 241.053(a)(3); *see also* 25 TEX. ADMIN. CODE §§ 133.1(c), 133.121(1)(F).

Given the foregoing, we conclude that the Carswells' post-mortem claims alleged departures from accepted standards of "professional or administrative services" the hospital had the duty to comply with or provide in order to maintain its license. But to be characterized as an HCLC, the "professional or administrative services" must have been directly related to health care. TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13). We next consider that factor.

## 2. Directly Related to Health Care

The Act defines "health care" as

any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider, for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement.

TEX. CIV. PRAC. & REM. CODE § 74.001(a)(10). "Medical care" is defined as

any act defined as practicing medicine under Section 151.002 [of the] Occupations Code, performed or furnished, or which should have been performed, by

one licensed to practice medicine in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement.

*Id.* § 74.001(a)(19).

Even if persons can no longer be patients after they die, a question we need not decide today, the inquiry does not end there. As to a claim based on professional or administrative services, the statute does not require that the person alleging injury was a patient during the relevant period. Neither does it require that the alleged injury must have occurred during or contemporaneously with health care, nor that the alleged injury was caused by health care. Rather, the Act applies to a claim for injury or death proximately caused by a "departure from accepted standards of medical care, or health care, or safety or professional or administrative services *directly related to* health care." *Id.* at § 74.001(a)(13) (emphasis added). Here, the question is whether the post-mortem claims by the Carswells were directly related to health care—that is, directly related to an act or treatment that was or should have been performed or furnished by the hospital for, to, or on behalf of Jerry Carswell during his treatment or confinement.

The Act does not define "directly related to," so we look to the words' common meanings. *See* TEX. GOV'T CODE § 311.011(a); *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 501 (Tex.2015). "Direct" or "directly," as most applicable here means "without the intervention of a medium or agent" or "immediately." BLACK'S LAW DICTIONARY 557 (10th ed.2014); *see also Sharp v. Tyler Pipe Indus., Inc.*, 919 S.W.2d 157, 162 (Tex.App.—Austin 1996, writ denied). "Related" is commonly defined as "[c]onnected in some way; having relationship to or with something else."

BLACK'S LAW DICTIONARY 1479 (10th ed.2014). When those definitions are combined, they yield the conclusion that the plain and common meaning of the phrase "directly related to" is "an uninterrupted, close relationship or link between the things being considered." *See City of Amarillo v. Fenwick*, 19 S.W.3d 499, 501 (Tex.App.—Amarillo 2000, no pet.) (construing the phrase "directly related to" in the context of the Texas Local Government Code).

The Carswells' post-mortem fraud claim was essentially that immediately following Jerry's death, the hospital began covering up for the deficient health care provided to him. That was done, they claimed, by the hospital's failing to notify the Harris County Medical Examiner's Office of Jerry's death and the circumstances surrounding it, but rather by the hospital immediately obtaining Linda's consent for an autopsy at an affiliated hospital by an associated pathology practice group. Even though the jury refused to find that CHRISTUS negligently caused Jerry's death, it remains that the Carswells' post-mortem fraud claim was that the hospital's obtaining Linda's consent for the autopsy was based on and for the purpose of concealing the hospital's malpractice that caused Jerry's death. Given these circumstances, the claim was directly related to acts or treatments the Carswells alleged were improperly performed or furnished, or that should have been performed or furnished, to Jerry during his treatment and confinement. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(10). As such, the fraud claim was an HCLC.

The court of appeals relied on two memorandum opinions from its sister courts to reach the conclusion that the Carswells' fraud claim was not an HCLC. 433 S.W.3d at 610. In one, *Hare v. Graham*, the plaintiff claimed the defendant doctor performed an autopsy without the surviving wife's consent, thereby violating her right to have her husband's body "preserved and buried in the condition in which he died, without her having thoughts of him being cut unnecessarily prior to his burial." No. 2–07–118–CV, 2007 WL 3037708, at *1 (Tex.App.—Fort Worth Oct. 18, 2007, pet. denied) (mem.op.). The appeals court interpreted the statute to mean that a person must be alive in order to be a "patient," then reasoned that because a dead body is not a patient, a person "does not receive 'medical care, treatment, or confinement' after death." *Id.* at *3. That being so, the court held that the alleged failure to obtain consent for the autopsy was not an HCLC. *Id.* But, unlike the Carswells' post-mortem claim, the plaintiff in *Hare* was not complaining that the post-mortem actions of the defendants were taken for the purpose of concealing deficient pre-mortem health care. As mentioned above, in this case we are not called upon to decide whether performing an autopsy or failing to obtain informed consent to perform an autopsy, without more, is health care, regardless of whether the autopsy was performed in a hospital or elsewhere.

In the second case relied on by the court of appeals, *Salazar v. Dickey*, the plaintiff sued the doctor who signed his father's death certificate without an autopsy having been performed. No. 04–08–00022–CV, 2010 WL 307852, at *1 (Tex.App.—San Antonio Jan. 27, 2010, pet. denied) (mem. op.). The plaintiff claimed the doctor was required to order an autopsy before signing the certificate, and because he was not present at the time of death and did not perform an autopsy, he committed fraud by signing a death certificate indicating that the decedent died of natural causes. *Id.* at *3. Citing *Hare* and relying on the same statutory definitions, the court determined that the claim was not an HCLC

because the plaintiff's father was already dead when the doctor allegedly departed from acceptable standards and practices. *Id.* at \*4. Additionally, the decedent could not have been a "patient," nor could the decedent have received medical care, treatment, or confinement after his death. *Id.* As was the situation in *Hare,* and unlike the claims here, the claims in *Salazar* were not linked to pre-mortem health or medical care of the deceased; they were based entirely on postmortem actions of the defendants that were directed to a dead body.

Next, the Carswells argue that their post-mortem fraud claim is not an HCLC because Linda was not a patient. The Carswells point to our decision in *Texas West Oaks,* in which they urge that we held HCLCs based on departures from standards of "medical care" and "health care" require the claimant to have been a patient. *See Tex. W. Oaks,* 371 S.W.3d at 178. They argue that the phrase "professional or administrative services directly related to health care" requires a patient-physician relationship because it incorporates the definition of "health care." *See id.* at 181 (holding that "specific statutory directive health care claims must involve a patient-physician relationship"). The Carswells posit that their fraud claim falls outside the scope of the definition of an HCLC because the injuries they suffered from the hospital's fraud did not involve an act rendered "for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." We disagree.

■ The Act does not limit its reach to persons receiving or having received health or medical care—it applies to "claimants." Tex. Civ. Prac. & Rem. Code § 74.001(a)(13). As to professional or administrative services, it applies when the claimed injury is directly related to health care of *some* patient. *See id.*

§ 74.001(a)(10), (13). As noted above, the professional or administrative services underlying the Carswells' complaint were directly related to the improper health care they alleged Jerry Carswell received, or health care they alleged he should have received but did not.

Because the Carswells' post-mortem fraud claim is an HCLC, we next consider whether it is barred by the Act's two-year statute of limitations provision. *See id.* § 74.251(a).

## B. Limitations

■ The Carswells amended their pleadings on January 5, 2007, to add the post-mortem fraud claim based on acts that occurred almost three years earlier. They make two arguments in asserting that the claim is not barred by the Act's two-year limitations provision. *See* Tex. Civ. Prac. & Rem. Code § 74.251(a). One is that their original petition alleged not only medical malpractice, but also "fraud," which encompassed the post-mortem claims. The second is that even if the post-mortem claims are HCLCs, their 2007 amended pleadings related back to the timely filed original petition. *See* Tex. Civ. Prac. & Rem. Code § 16.068 (providing that claims raised in a subsequent amended pleading relate back to a timely filed pleading and are not barred by limitations unless the amendment or supplemental pleading "is wholly based on a new, distinct, or different transaction or occurrence").

As to the first argument, the fraud allegation in the Carswells' original petition was one word—"fraud":

Plaintiffs complain that the Defendants' conduct and omissions constituted, among other things, medical malpractice, negligence, gross negligence, negligence per se, malice, fraud, and breach

of express and implied warranties and breach of contract.

As we have set out more fully above, there were no allegations in that pleading as to post-mortem facts or actions, nor were there any claimed damages based on post-mortem events. Rather, the petition referred only to claims arising from "the medical malpractice . . . that ultimately resulted in the death of Jerry L. Carswell on January 22, 2004," the "substandard medical care [that] resulted in the death of Jerry L. Carswell," and "medical negligence, which proximately led to the death of Jerry L. Carswell." The damages sought were those accruing up until, and resulting from, Carswell's death. The word "fraud," in the context of the facts pleaded, references to medical malpractice, Jerry's death, and damages based on medical malpractice, simply cannot be stretched to encompass the post-mortem fraud claim.

Our analysis of the original petition is consistent with the Carswells' Third Amended Original Petition in which they first asserted the post-mortem claims. In that Amended Petition, as we have explained more fully above, pre-mortem facts are set out in a paragraph entitled "VI. Medical Malpractice Facts." Then, in a separately numbered section labeled "VII. Wrongful Death and Survival Causes of Action," CHRISTUS, as well as Drs. Pramudji and Cook and their practice group, Memorial Urology Associates, P.A. are specifically labeled as "medical malpractice defendants." The next section, again separately numbered and labeled as "VIII. Post–Mortem Facts," details allegations as to the post-mortem actions of the hospital, its nurses, and various physicians. Another section labeled "IX. Post–Death, Non-Medical Liability and Insurance Improvement Act Causes of Action," identified CHRISTUS, Hospital Partners of America, three pathologists, and SJ Associates

Pathologists, L.C. as "Post–Mortem Defendants."

As to the second argument, the Carswells urge that if we determine the post-mortem fraud claim is an HCLC, then it necessarily relates back to the date of their original pleadings asserting the pre-mortem medical malpractice claims. The Carswells contend that if the fraud claim is classified as being based on a professional or administrative service that is directly related to health care, it is completely illogical that the claim can at the same time be based on a new, distinct, or different transaction or occurrence from that underlying the pre-mortem medical malpractice claims.

CHRISTUS counters that the pre-mortem claims for malpractice and the post-mortem fraud claim, while both HCLCs, are based on separate, distinct, or different transactions or occurrences. It contends that whether the post-mortem fraud claim is an HCLC and whether the relation-back doctrine applies to it are different questions with different considerations. We agree with CHRISTUS.

It is apparent from what we have set out above that the facts underlying the Carswells' pre-mortem medical malpractice claims (1) are separated in time from the facts underlying the claim for damages based on post-mortem fraud, (2) are based on facts different and distinct from those underlying the fraud claim, and (3) involve a different set of occurrences from that underlying the fraud claim. The acts and omissions underlying the medical malpractice claims allegedly caused Carswell's death. The acts underlying the post-mortem claim did not, and indeed could not, have had any causal relationship to his death. *See Alexander v. Turtur & Assocs., Inc.,* 146 S.W.3d 113, 121–22 (Tex. 2004) (holding that when an amended peti-

tion "sets up a distinct and different claim from that asserted in the previous petitions, the new claim does not relate back"). We conclude that the post-mortem fraud claim does not relate back to the filing of the original petition and is barred by the Act's limitations provision.

### C. Fiduciary Duty and Negligence Claims

■ In addition to finding that CHRISTUS committed fraud against Linda "in connection with obtaining [her] consent for the autopsy to be performed on Jerry Carswell's body," the jury found that the hospital failed "to comply with its fiduciary duty to Linda Carswell in connection with obtaining [her] consent for the autopsy," and that the hospital was negligent "in connection with obtaining [her] consent for the autopsy." The court of appeals considered only the fraud finding on which the Carswells elected to recover. CHRISTUS challenges the findings as to fiduciary duty and negligence for various reasons, one of them being that it did not have a fiduciary duty to Linda Carswell to begin with. But we need not consider either of those findings in depth. Given our conclusion that CHRISTUS's actions in connection with Linda's consenting to the autopsy are recast HCLCs, it follows that both the breach of fiduciary duty and negligence claims founded upon the same factual bases are likewise recast HCLCs. *See Yamada v. Friend,* 335 S.W.3d 192, 197 (Tex. 2010) ("[I]f the gravamen or essence of cause of action is an [HCLC], then allowing the claim to be split or spliced into a multitude of other causes of action would contravene the Legislature's explicit requirements."). As such, they are barred by limitations for the same reasons the fraud claim is barred.

### D. Sanctions

In their cross-petition, the Carswells argue that the court of appeals erred by vacating the monetary sanctions imposed against CHRISTUS. They contend that the trial court's sanctions order and the record reflect the $250,000 monetary sanction was not an arbitrary fine without evidentiary support, as the court of appeals determined. They first assert that the sanctions order stated it was based on the "significant time and monetary resources" expended by the Carswells—which they argue "denotes attorney's fees"—in developing their case after CHRISTUS did not properly disclose evidence during discovery. Citing two court of appeals opinions, they argue that when attorney's fees are awarded as sanctions, the sanctions need not be supported by evidence of attorney's fee bills. *See Prize Energy Res., L.P. v. Cliff Hoskins, Inc.,* 345 S.W.3d 537, 575–76 (Tex.App.—San Antonio 2011, no pet.); *Scott Bader, Inc. v. Sandstone Prods., Inc.,* 248 S.W.3d 802, 816–17 (Tex.App.—Houston [1st Dist.] 2008, no pet.). The Carswells also argue that evidence supports the sanctions as an assessment for the trial court's unnecessary expenditure of time on discovery matters, which under the circumstances were properly awarded to them. In the alternative, the Carswells argue that the court of appeals erred by reversing and rendering judgment as to the sanctions instead of remanding the issue to the trial court for clarification. We address those arguments in turn.

■ First, the court of appeals did not determine that the lack of attorney's fee bills was the sole consideration in its determination that there was legally insufficient evidence to support the sanctions. 433 S.W.3d at 616–17 & n. 11. Texas Rule of Civil Procedure 215.2(b)(8) authorizes a trial court to charge the party abusing the discovery process with the reasonable expenses, including attorney's fees, caused

by the failure to obey discovery orders. These sanctions are designed to rectify discovery abuse by compensating the aggrieved party for expenses incurred. *See* TEX. R. CIV. P. 215.2(b)(8); *Ford Motor Co. v. Tyson*, 943 S.W.2d 527, 533 (Tex.App.—Dallas 1997, orig. proceeding). Consequently, when a party seeks attorney's fees as sanctions, the burden is on that party to put forth some affirmative evidence of attorney's fees incurred and how those fees resulted from or were caused by the sanctionable conduct. *See Scott Bader*, 248 S.W.3d at 816–17; *Glass v. Glass*, 826 S.W.2d 683, 688–89 (Tex.App.—Texarkana 1992, writ denied). However, while properly proved bills showing attorney's fees the Carswells incurred as a result of discovery abuse might have been legally sufficient evidence to support a monetary sanction, no such evidence is present in the record so it can be evaluated. *See Scott Bader*, 248 S.W.3d at 816. But here there were not only no bills to support a finding as to the amount of time the Carswells' attorneys necessarily expended as a result of sanctionable conduct by the hospital, there was no other evidence. Nor was there evidence as to the hourly rate or other evidence of an amount that would compensate for that time, even if the time had been proved. The Carswells' motions and pleadings contained various allegations as to both, but pleading allegations are not evidence.

▮▮▮ Next, the Carswells argue that the monetary sanctions were based on attorney's fees reflected by the first eleven volumes of the appellate record. Rule 215.2 allows a trial court to require the party who failed to obey a discovery order to pay "the reasonable expenses, including attorney fees, caused by the failure" and to make such orders regarding the failure as are just. *See* TEX. R. CIV. P. 215.2(b), (b)(8). But to be just, a sanction must be

based on a direct relationship between the particular offensive conduct and the sanction imposed, and the sanction must not be excessive vis-a-vis that conduct. *See Petrol. Solutions, Inc. v. Head*, 454 S.W.3d 482, 489 (Tex.2014); *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex.1991).

Although a trial on the merits was not conducted on the Carswells' motions for monetary sanctions, hearings were. The Carswells do not complain that they were not afforded full opportunity to present evidence supporting the sanctions they sought for particularized sanctionable conduct by CHRISTUS. *See* 433 S.W.3d at 617 (noting that a party should be afforded an opportunity to present evidence in support of its claims and analogizing uncontested trials and uncontested hearings); *Mobil Oil Corp. v. Frederick*, 621 S.W.2d 595, 596 (Tex.1981). As the court of appeals noted, not only was there no evidence to prove the amount of attorney's fees and expenses, the trial court did not explain its rationale behind the amount imposed as monetary sanctions or the relationship between the sanctions and particular conduct of CHRISTUS. And, given the lack of evidence, the court of appeals concluded it had no way to determine whether the sanction was just or excessive. 433 S.W.3d at 616–17 (citing *TransAmerican*, 811 S.W.2d at 917). It further concluded that remand was not appropriate because no evidence supported the sanctions. *Id.* at 617 (citing *Dolgencorp of Tex. v. Lerma*, 288 S.W.3d 922, 929 (Tex.2009) ("Generally, if an appellate court holds there is legally insufficient evidence to support a judgment after a trial on the merits, the proper disposition is to reverse and render judgment.")).

The Carswells cite cases from various Texas courts of appeals, as well as this Court's opinions in *Nath v. Texas Chil-*

*dren's Hospital*, 446 S.W.3d 355, 371–72 (Tex.2014), and *Low v. Henry*, 221 S.W.3d 609, 621–22 (Tex.2007), in support of their argument that the court of appeals should have remanded the issue of monetary sanctions to the trial court for reconsideration. *See, e.g., Graves v. Tomlinson*, 329 S.W.3d 128, 151–52 (Tex.App.—Houston [14th Dist.] 2010, pet. denied); *State Office of Risk Mgmt. v. Foutz*, 279 S.W.3d 826, 838 (Tex.App.—Eastland 2009, no pet.); *Van Es v. Frazier*, 230 S.W.3d 770, 784 & n.5 (Tex.App.—Waco 2007, pet. denied). The authorities they cite are distinguishable. While the courts of appeals in those cases remanded the issue of monetary sanctions, there was some evidence in those records as to the propriety and amount of the sanction. Similarly, in *Nath* and *Low*, there was some evidence in the records for the trial courts to have considered in awarding sanctions. *Nath v. Texas Children's Hosp.*, 446 S.W.3d at 371–72; *Low*, 221 S.W.3d at 621–22 (determining that the trial court was within its discretion to award monetary sanctions, but remanding the issue regarding the amount imposed based on the trial court's failure to explain how it assessed the amount of the sanction).

■ Finally, citing *Low*, the Carswells argue that the trial court based monetary sanctions on the waste of judicial resources resulting from the hospital's discovery abuse. In *Low*, we were considering the amount of a monetary sanction under Chapter 10 of the Texas Civil Practice and Remedies Code for filing frivolous pleadings. *Low*, 221 S.W.3d at 620–21. We referenced a list of factors the American Bar Association recommended trial courts should consider in assessing the amount of monetary sanctions to impose. *Id.* at 620 n. 5. The factor in that list most relevant to this case is the "burdens on the court system attributable to the miscon-

duct, including consumption of judicial time and incurrence of juror fees and other court costs," which the Carswells characterize as the "waste of the trial court's time and resources." *See id.* The Carswells primarily base this argument on federal cases interpreting federal rules, which allow courts to impose monetary sanctions as a penalty for wasting judicial time and resources. Those sanctions are paid directly to the court. *See, e.g., Seneca Res. Corp. v. Moody*, 135 B.R. 260 (S.D.Tex. 1991) (interpreting Federal Rule of Civil Procedure 11); *Thiel v. First Fed. Sav. & Loan Ass'n*, 646 F.Supp. 592, 598 (N.D.Ind.1986) (same); *Huntington Nat'l Bank v. Bruinsma*, 475 B.R. 602, 610–12 (Bankr.W.D.Mich.2012) (interpreting Federal Rule of Bankruptcy Procedure 9011). The Carswells urge us to consider the formula adopted by federal courts for calculating and awarding monetary sanctions for wasting judicial resources. *See, e.g., Bruinsma*, 475 B.R. at 610–12; *Thiel*, 646 F.Supp. at 598. We decline to do so. Our rules do not provide for sanctions based on how much time courts spend on hearings. *See* Tex. R. Civ. P. 215.2(b)(8). Trial courts have discretion to impose monetary sanctions within limits, but any sanctions must be directed toward remedying prejudice caused to the innocent party. *See* Tex. R. Civ. P. 215.2; *Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 882 (Tex.2003).

## III. Conclusion

We conclude that (1) the post-mortem fraud claim is a health care liability claim; (2) the claim is barred by the Act's two-year limitations period, as are the claims for breach of fiduciary duty and negligence that are based on the same underlying facts; and (3) the court of appeals did not err by reversing and rendering judgment as to the monetary sanctions. According-

ly, we reverse in part, affirm in part, and render judgment for CHRISTUS.