**Affirmed and Memorandum Opinion filed January 28, 2021.**



In The

# Fourteenth Court of Appeals

## NO. 14-19-00024-CV

### REGINALD W. BRYANT AND FREDA R. BRYANT, Appellants

### V.

### BRAZOS KIDNEY DISEASE CENTER, CENTRAL TEXAS NEPHROLOGY ASSOCIATES, P.A., DR. ROBERT J. GO, MD, ADELE MARY GADLIN, RN, KAY DUNLAP, LMSW, JENNIFER ROBINSON, RLD, LAURA DAILEY, RLD, Appellees

**On Appeal from the 170th District Court**
**McLennan County, Texas**
**Trial Court Cause No. 2018-846-4**

## MEMORANDUM OPINION[1]

Reginald and Freda Bryant, both appearing *pro se*, challenge the trial court's orders dismissing their lawsuit based on their failure to comply with the expert-

---

[1] The Texas Supreme Court ordered the Tenth Court of Appeals to transfer this case to this court. We must therefore decide the case in accordance with the precedent of the Tenth Court of Appeals if our decisions would have been otherwise inconsistent with that court's precedent. *See* Tex. R. App. P. 41.3.

report requirement found in the Texas Medical Liability Act ("the TMLA"). In three issues, Appellants contend that their claims for "libel by health-care professionals" and for falsification or fabrication of medical records are not claims governed by the Act; alternatively, they argue that the medical records at issue are not so "directly connected" to Reginald's health care that they are governed by the TMLA. We affirm.

## I.     BACKGROUND AND PROCEDURAL HISTORY

This case arises out of Reginald Bryant's treatment for end-stage renal disease at Appellee Brazos Kidney Disease Center ("Center"). Appellee Robert J. Go, MD, an employee-member of Appellee Central Texas Nephrology Associates, P.A. ("CTNA"), was Reginald's supervising physician. Appellees Adele Mary Gadlin, RN, Kay Dunlap, LMSW, Jennifer Robinson, RLD and Laura Dailey, RLD were employees of the Center.[2] The record before us shows Reginald's course of treatment at the Center involved in-center hemodialysis, with each session requiring several hours to complete, and with appointments every two to four days. Bryant began treatment in January 2013 and continued to receive treatment at the Center for over four years.

Throughout his treatment at the Center, Reginald's progress was evaluated periodically and noted on "Interdisciplinary Team Evaluation of Stability Status" ("ITESS") forms. Beginning in February 2017, these ITESS evaluations recorded "disruptive" and "abusive" behavior toward doctors and staff during treatment and identified Reginald as being "at risk for involuntary discharge or transfer." Each of the ITESS forms in question were signed by Go, Gadlin, Dunlap and either Robinson or Dailey.

---

[2] As used in this opinion, the term "Appellees" will refer to all persons and entities who were Defendants in the trial court.

By letter dated September 14, 2017, Reginald was discharged as a patient by CTNA. The discharge letter cited Reginald's "continued refusal to communicate with your Nephrology Medical Team" along with his "disruptive and hostile behavior [which] endangers your care as well as that of adjacent patients," as the basis for his discharge. That same day, the Center discharged Reginald because he no longer had a supervising physician.

On March 7, 2018, the Bryants, appearing *pro* se, filed suit in McLennan County against Appellees. The Bryants' First Amended Original Petition asserts claims for defamation (based on allegedly false statements on Reginald's ITESS forms), intentional infliction of emotional distress (based on those allegedly false statements and those in his discharge letter), negligence "due to the Physician/Patient relationship," and negligence *per se* (based on a violation of Tex. Penal Code §37.10). The Bryants contend the ITESS entries were false and defamatory and caused him harm by making it more difficult to transfer to a different clinic to continue his treatment. The Bryants sought monetary damages in connection with those claims.

Appellees CTNA and Go answered on March 16, 2018, asserting special exceptions and affirmative defenses to the Bryants' claims; they filed a Motion to Dismiss five months later, on August 15. Appellees Gadlin, Dunlap, Robinson, Dailey and the Center likewise answered on March 30, 2018, asserting special exceptions and affirmative defenses, and moved to dismiss the Bryants' claims on August 17, 2018. Both Motions to Dismiss asserted that the Bryants claims were in fact health care liability claims subject to the TMLA, and that the Bryants' failure to file an initial expert report in support of those claims within the 120-day time frame required by the TMLA precluded their causes of action. Tex. Civ. Prac. & Rem. Code §74.351(a). The motions further contended that the medical records

at issue were "professional or administrative services directly related to health care" and that any claims arising out of those services were health care liability claims subject to the TMLA. The Bryants' response included more than 550 pages of Reginald's medical records as exhibits. The Bryants also moved for traditional summary judgment on their claims.

On September 27, 2018, the trial court signed two orders dismissing the Bryants' claims with prejudice and denying summary judgment to the Bryants. The Bryants filed a Motion for New Trial on October 1, 2018; that motion was denied by order dated October 22, 2018. This appeal followed.

## II. ANALYSIS

In three issues, the Bryants[3] dispute the trial court's application of the TMLA to their causes of action.[4] They contend, first, that the trial court erred in dismissing their cause of action for defamation because "defamation by [a] health care professional" is not subject to the TMLA's requirement of an initial expert report; second, that their claim for "falsification and fabrication of medical records" is not subject to the TMLA; and third, that the medical records at issue do not qualify as the type of "professional and administrative services" made subject to the TMLA.

## A. STANDARD OF REVIEW AND APPLICABLE LAW

We review the trial court's decision to grant a motion to dismiss under the TMLA for an abuse of discretion. *McIntyre v. Ramirez*, 109 S.W.3d 741, 749 (Tex. 2003). Under this standard, the appellate court defers to a trial court's

---

[3] Freda Bryant filed a separate appeal on her own behalf, but does not state claims distinct from Reginald's claims. The parties do not raise any issues on appeal regarding Freda Bryant's claims.

[4] The Bryants did not appeal the dismissal of their negligence-based claims.

4

factual determinations, but reviews *de novo* questions of law involving statutory interpretation. *Univ. of Tex. Health Sci. Ctr. at Houston v. Joplin*, 525 S.W.3d 772, 776 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). A trial court has no discretion in determining what the law is or applying the law to the facts. *Univ. of Tex. Med. Branch at Galveston v. Callas*, 497 S.W.3d 58, 62 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

The dispositive question in this appeal -- whether the Bryant's causes of action are "health care liability claims" subject to the TMLA -- is primarily one of statutory interpretation. *Loaisiga v. Cerda*, 379 S.W.3d 248, 254–255 (Tex. 2012). When construing a statute, our goal "is to determine and give effect to the Legislature's intent" beginning with the "plain and common meaning of the statute's words." *Tex. W. Oaks Hosp. L.P. v. Williams*, 371 S.W.3d 171, 177 (Tex. 2012)(internal quotation omitted). Whether a claim is a health care liability claim under the TMLA is a question of law that we review *de novo*. *Id*. In determining the question, we examine the underlying nature and gravamen of the claim, rather than the way it is pleaded. *Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 543 (Tex. 2004).

The TMLA, which is codified at Chapter 74 of the Civil Practice and Remedies Code, was first enacted in 2003 as a comprehensive, top-to-bottom medical-malpractice reform measure to "make affordable medical and health care more accessible and available to the citizens of Texas," and to "do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis." *Methodist Healthcare Sys. of San Antonio Ltd., L.L.P. v. Rankin*, 307 S.W.3d 283, 287 (Tex. 2010) (internal citations omitted).

At issue here is the TMLA's definition of a health care liability claim:

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

Tex. Civ. Prac. & Rem. Code §74.001(a)(13). Plaintiffs asserting a health care liability claim must file an expert report in support of that claim within 120 days of the filing of a defendant's original answer. *Id.* §74.351(a). If, as here, no report is filed, the trial court must dismiss the claim with prejudice upon motion of an affected party. *Id.* §74.351(b). The purpose of this "threshold" expert report requirement is intended as a "substantive hurdle that helps ensure frivolous claims are eliminated quickly." *Spectrum Healthcare Res., Inc. v. McDaniel*, 306 S.W.3d 249, 253 (Tex. 2010).

Courts have distilled from this statutory definition a three-prong test. If (1) the defendant is a health care provider or physician; (2) the claimant's cause of action is for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, health care, or safety or professional or administrative services directly related to health care; and (3) the defendant's alleged departure from accepted standards proximately caused the claimant's injury or death, then the cause of action is a health care liability claim. *Tex. W. Oaks Hosp.*, 371 S.W.3d at 179–180.

In subsequent cases, the Supreme Court has further refined this three-part test into a working presumption. Relying on the TMLA's consistent use of broad language — particularly the statute's expansive definition of "health care" — the Court found the TMLA "essentially creates a presumption that a claim is [a health-care liability claim] if it is against a physician or health care provider and is based

6

on facts implicating the defendant's conduct during the course of a patient's care, treatment, or confinement." *Loaisiga*, 379 S.W.3d at 256. The presumption can be rebutted on a showing that "the only possible relationship between the conduct underlying a claim and the rendition of medical services or healthcare will be the healthcare setting . . . the defendant's status as a doctor or health care provider, or both." *Id.*

Because the Bryants' issues on appeal arise out of the same operative facts, we first consider whether the Bryants' causes of action trigger the presumption in *Loaisiga*; if so, we will next determine if the Bryants have rebutted that presumption.

### B. APPLICATION

We determine whether the Bryants' claims were properly dismissed by examining the overall context of the their suit, the nature of the facts alleged in the pleadings, those found in the motions to dismiss, the response, and any relevant evidence properly admitted. *Loaisiga*, 379 S.W.3d at 258–59. We are not bound by the parties' characterization of those facts in their pleadings or other papers. *CHRISTUS Health Gulf Coast v. Carswell*, 505 S.W.3d 528, 534 (Tex. 2016).

#### 1. DO THE UNDERLYING FACTS GIVE RISE TO THE PRESUMPTION OF A HEALTH CARE LIABILITY CLAIM?

The presumption that the Bryants are asserting health care liability claims is triggered on a showing that their causes of action are against a physician or health care provider and is based on facts implicating the defendant's conduct during the course of a patient's care, treatment, or confinement. *Loaisiga*, 379 S.W.3d at 256. Here, the Bryants' causes of action are based on entries in the medical records maintained by the Center during Reginald's four-year course of medical treatment, which were then published to other health care providers to facilitate their

7

provision of medical care to Reginald Bryant. The harm complained of involves publication of those entries to other health-care providers.

### a. APPELLEES ARE PHYSICIANS OR HEALTH CARE PROVIDERS.

Appellees are all "health care providers" as that term is defined under section 74.001(a)(12) of the TMLA. Tex. Civ. Prac. & Rem. Code §§74.001(a)(12)(A)(Robert J. Go, supervising physician; CTNA, his professional association); 74.001(a)(12)(A)(i)(Adele Mary Gadlin, registered nurse); 74.001(a)(12)(B)(ii)(Kay Dunlap, social worker, Jennifer Robinson, dietitian, and Laura Dailey, dietitian, as employees of the Center). The Center is both a "health care institution" and a "health care provider" under the TMLA. *Id.* §§ 74.001(a)(11)(K), 74.001(a)12(A)(vii).

### b. THE BRYANTS' CAUSES OF ACTION IMPLICATE APPELLEES' CONDUCT DURING THE COURSE OF REGINALD'S CARE, TREATMENT OR CONFINEMENT.

Reginald Bryant's periodic assessment includes evaluation by team members of his ability to cooperate in the rendition of treatment and to adhere to the requirements of his treatment plan. Tex. Admin. Code§117.45(a)(9). The Bryants' pleadings allege that Reginald's ITESS sheets – and the termination letter from CTNA – contain "false statements . . . pertaining to his behavior" during Reginald's treatment sessions at the Center.

The ITESS sheets state that a patient is considered unstable if certain conditions exist, *i.e.*, extended or frequent hospitalizations, marked deterioration in health status, significant changes in psychosocial needs, or concurrent poor nutritional status, unmanaged anemia, and inadequate dialysis. On February 20, April 24, April 25, June 26, July 3, and August 15, of 2017, Reginald's ITESS sheets, which were signed by Appellants, stated he had significant changes in

8

psychosocial needs severe enough to interfere with his ability to follows aspects of his treatment plan. The completed forms note that Reginald Bryant was "still very unpredictable in behavior" (ITESS February 20, 2017), "verbal abuse to MD's and hospital staff" (April 24, 2017), "refused to attend POC [Plan of Care] meeting" (annual report April 25, 2017) and accompanying notes indicating he was disruptive or verbally abusive to medical staff (June 26, 2017, July 3, and August 15, 2017). Each of the ITESS forms in question were signed by Go, Gadlin, Dunlap and either Robinson or Dailey.

The ITESS forms described Reginald as being "at risk" of a poor medical outcome based on his uncooperative behavior. The September 14, 2017 discharge letter echoes these concerns, as well as the risks Reginald's conduct created for other patients. The letter states that CTNA could not provide effective medical care to Reginald Bryant due to failure to engage with medical staff during clinic rounds to discuss treatment or medical well-being, refusal to meet with medical staff to discuss his annual plan of care or discuss monthly reviews indicating Reginald's status as "unstable," a history of verbal abuse and hostility toward medical staff and walking out of a Plan of Care meeting to discuss conditional status with CTNA.

End-stage renal disease facilities, such as the Clinic, are required by statute to pair kidney dialysis with treatment plans which address patients' "psychological, social, and functional needs," all in an effort to improve medical outcomes. 25 Tex. Admin. Code §117.45(a)(2). The "interdisciplinary team" – a patient's primary dialysis physician, registered nurse, dietitian and social worker -- must evaluate the effectiveness of the treatment plan and sign off on a periodic progress report. *Id.* §§117.45(a)(1), 117.45(a)(7). Thus the Bryants' causes of action are based on statements which relate to his health care and were an integral part of his

9

treatment.

Although the Bryants attempt to recast their causes of action as claims solely based on defamation, the allegedly defamatory statements are all located in Reginald's medical records and all relate to his course of treatment at the Center, as well as how his behavior affects his care. These facts demonstrate that the Bryants' claims fall within the TMLA's definition of health care liability claims. Tex. Civ. Prac. & Rem. Code §74.001(a)(13). Thus the circumstances which would give rise to the presumption set forth in *Loaisiga* are invoked. *Loaisiga*, 379 S.W.3d at 256.

## 2. DID THE BRYANTS SUCCESSFULLY REBUT THE PRESUMPTION?

Because the TMLA's text has been broadly interpreted, there is a rebuttable presumption that a patient's claims against a physician or health care provider, based on facts implicating the physician's conduct during the patient's care, treatment, or confinement are health care liability claims implicating the TMLA. *Loaisiga*, 379 S.W. 3d at 256. In relation to the TMLA, cases have examined whether the duty allegedly breached "implicates the defendant's duties as a health care provider" as opposed to duties owed to the public at large. *See, e.g., T.C. v. Kayass*, 535 S.W.3d 169, 174 (Tex. App.—Fort Worth 2017, no pet.)(presumption held rebutted when defendant doctor allegedly obtained plaintiff's telephone number from a medical chart and sent her a "harassing message" via text); *Drewery v. Adventist Health Sys./Tex., Inc.*, 344 S.W.3d 498, 499 (Tex. App.— Austin 2011, pet. denied)(no health-care liability claim involved when nurses painted surgical patient's fingernails and toenails pink, and wrote their names on the soles of his feet; acts were clearly "separable from the provision of medical care"); *see also Reddic v. E. Tex. Med. Ctr. Reg'l Health Care Sys.*, 474 S.W. 3d 672, 675 (Tex. 2015)(slip and fall negligence case not a health care liability claim

under the TMLA when it lacked a "substantive nexus" to the provision of health care beyond the place where the incident occurred).

In this case, however, the Bryants have failed to rebut the presumption. Unlike the claims at issue in *T.C.*, the maintenance of accurate medical records regarding treatment directly implicates duties owed by health care providers in the provision of health care. *Compare T.C.*, 535 S.W.3d at 174 *with Baylor Scott & White, Hillcrest Med. Ctr. v. Weems*, 575 S.W.3d 357, 364 (Tex. 2019).

### a. ARE THE BRYANTS' CAUSES OF ACTION "DIRECTLY RELATED TO" THE PROVISION OF HEALTH CARE?

In their third issue, the Bryants contend the discharge letter and ITESS records are not "directly related" to Reginald's medical care and therefore do not constitute a health care liability claim. We disagree.

"Administrative services" subject to the TMLA are defined as

> those duties or services that a physician or health care provider is required to provide as a condition of maintaining the physician's or health care provider's license, accreditation status, or certification to participate in state or federal health care programs.

Tex. Civ. Prac. & Rem. Code §74.001(a)(24). The ITESS sheets at issue are expressly required under the regulations governing end-stage renal disease facilities and defined as a mandatory part of a dialysis patient's treatment record. 25 Tex. Admin. Code §§117.45(a), 117.47(7), (8). Compliance with these regulations is essential to the maintenance of the Center's license. Tex. Health & Safety Code §251.062(a). Because they are statutorily required as part of the patient record, they are directly related to Bryant's health care. Similarly, the discharge letter from Appellee CTNA to Reginald is required by regulations governing medical records kept by a physician. 22 Tex. Admin. Code §165.1(a)(requiring physician's patient records to be "complete, contemporaneous

and legible"); *id*. §165.1(a)(8)(record to include copies of significant correspondence with patient). Maintenance of complete and accurate medical records is likewise essential to maintenance of a physician's license. *Id.* §160.20(5). Both types of records purport to document the care and treatment sought and received by Reginald Bryant.

The Bryants rely primarily on *Carswell* in disputing whether Reginald's medical records are directly related to his health care. *See* 505 S.W.3d at 536. *Carswell* involved both malpractice in the death of a patient and fraud in connection with the patient's autopsy. *Id.* The jury awarded damages based on the fraud claim but not the malpractice claim, and the issue on appeal became whether the fraud claim was a health care liability claim as defined by the TMLA. *Id*. at 536–37. The court ultimately found that because fraud found by the jury was committed in order to cover up a provider's malpractice, the claim had an "uninterrupted, close connection" to the alleged malpractice and therefore constituted a health care liability claim. *Id.* at 536.

The Bryants' reliance on *Carswell* is misplaced. While *Carswell* did refine what it meant for a claim to be "directly related to" health care, that definition, if applied here, would not change the outcome. A person's medical records have an "uninterrupted, close relationship or link" to health care rendered to that person. *TTHR, L.P. v. Coffman*, 338 S.W.3d 103, 109 (Tex. App.—Fort Worth 2011, no pet.)("There can be no 'administrative service' more directly related to the rendition of health care than the memorialization of that care.") Because the records at issue are Reginald's medical records which document his treatment at the Center, we conclude the Bryants have failed to rebut the presumption that their claims are health care liability claims.

12

### b. DO THE BRYANTS' CLAIMS FALL WITHIN AN EXCEPTION TO THE DEFINITION OF A HEALTH CARE LIABILITY CLAIM?

In their first and second issues, the Bryants contend that false statements found in medical records "are not healthcare liability claims and, therefore, do not trigger the expert report requirements" because they fit within an exception to the TMLA. The Bryants' arguments here, like those asserted in their Motion for New Trial, are predicated almost entirely on *Weems v. Baylor Scott & White, Hillcrest Med. Ctr.*, 566 S.W.3d 293 (Tex. App.—Texarkana 2017), *rev'd.*, 575 S.W.3d 357 (Tex. 2019) and its predecessor case, *Benson v. Vernon*, 303 S.W.3d 755, 759 (Tex. App. —Waco 2009, no pet.). In *Weems*, a transfer case from the Waco Court of Appeals, the Texarkana Court of Appeals applied the Waco court's prior precedent and held that claims of "alteration and fabrication of medical records" are not health care liability claims subject to the TMLA's expert report requirements." 566 S.W.3d at 294 (citing *Benson,* 303 S.W.3d at 759). In *Benson*, the Waco Court of Appeals stated simply that alteration and fabrication of medical records "is not a health care liability claim required to be addressed in an expert report." *Benson,* 303 S.W.3d at 759 (citing Tex. Civ. Prac. & Rem. Code §74.001(a)(13)).

*Weems* was appealed to the Texas Supreme Court, which reversed. The *Baylor Scott & White* Court held that the gravamen of a claim based on false entries in a patient's medical records involves breach of a health care provider's duty to maintain accurate records. *Baylor Scott & White*, 575 S.W.3d. at 363–364. Because this duty is "directly related to health care," a breach of that duty involves a "claimed departure from accepted standards of . . . administrative services" and so met the definition of a "health care liability claim" under the TMLA. *Id*. at 365–366 (citing Tex. Civ. Prac. & Rem. Code §74.001(a)(13)). As a result of a change in the law, the Bryants can no longer rely on the *Benson* exception to the

TMLA's definition of a health care liability claim. The presumption that the Bryants' causes of action are health-care liability claims once again stands unrebutted.

In sum, the Bryants have not shown that the trial court erred in granting Appellees' motions to dismiss for failure to file an expert report as required by the TMLA. Tex. Civ. Prac. & Rem. Code §74.351(b).

The Bryant's first, second, and third issues are overruled.

### III. Conclusion

We affirm the orders of the trial court.

/s/ Margaret "Meg" Poissant
   Justice

Panel consists of Justices Bourliot, Hassan, and Poissant.

14